These two suits are to restrain the construction of two apartment houses, one by each defendant, on the ground that they would violate restrictive covenants of a community scheme, to erect only one and two-family houses not more than two and a half stories high, with fifteen-foot set back, and no flat roofs. The area of the community is small, and is bound on the north and east by the Weequahic Park tract, on the south by Lyons avenue and on the west by Osborne terrace, a street. The length is north to south. Four streets, Scheerer, Shephard, Mapes and Lehigh avenues, extend across the width from Osborne terrace to, and coincide with, streets on the Weequahic Park tract. The plot was owned by the Charles Selvage Company, the common grantor, under which the complainants and defendants hold title. All the company's holdings on the four avenues have been sold, the last three lots to one Rednevitz, two of which he conveyed to the defendants. All the land on the four avenues, except Rednevitz's remaining lot and one other, is now built up by one and two-family houses — seventy-four in all; all set back; none with flat roofs, nor more than two and a half stories high. On the two lots of the defendants, the Leslie Construction Company, on Shepherd avenue, and Levine Brothers, Incorporated, on Mapes avenue, have started *Page 571 
the erection of three-story apartment houses, one for twelve families, the other for eighteen. Both these lots immediately adjoin the Weequahic Park tract. The avenues were laid out across the tract before the Charles Selvage Company acquired it. The plot was never laid out in lots and mapped. The company sold in parcels to suit buyers, usually speculative builders. Most times the conveyances contained restrictions, sometimes not. The first three of the thirty-five conveying all the building lots on the four avenues contain none, nor do the last three. The restrictions in the remaining twenty-nine deeds are uniform in this only, that no house shall be higher than two and a half stories and shall not have a flat roof. In other respects they vary materially. In two, for lots on different streets, the set-back is twenty-three feet and the covenants expire, one January 1st, 1925, the other January 1st, 1930. In the others the set-back is fifteen feet, except on the south side of Lehigh avenue, where it is six feet. Some lots are restricted to one dwelling house, some to one and two-family houses; some have no limit. All restrictions call for a minimum cost of house, and this varies, ranging from $3,500 to $8,000, irrespective of location.
The defendants take the broad position that, although a neighborhood scheme, by covenant, obligatory upon all preceding lot owners, be established, and of which the defendants had notice, they are not bound to an observance, because the covenant is not in their deed or chain of title. Their argument amounts to this: that the company, having sold all its lots but a few, is at liberty to destroy the advantages of a residential scheme by conveying the remnant without covenant, and they rely onBeattie v. Howell, 98 N.J. Eq. 163, and Ferraro v.Kozlowski, 101 N.J. Eq. 532, as sustaining this anomalous proposition. Neither does. The cases were for preliminary restraints upon the violation of building restrictions. In the first there appears to have been a community scheme, but Vice-Chancellor Bentley denied relief, not because there was no concurring covenant, but for the reason that the defendant had no notice of the scheme in fact, or constructively by covenant in his deed or chain of *Page 572 
title, as the penultimate paragraph of his opinion indicates; and in the other he held there was no neighborhood scheme. One who buys with notice of a mutually covenanted community scheme is as firmly bound in conscience to observe it as if he had himself covenanted; and a restrictive covenant in his chain of title charges him with notice. Notice imputes responsibility. Sanford
v. Keer, 80 N.J. Eq. 240; Scull v. Eilenberg, 94 N.J. Eq. 759.
Equity does not require his personal covenant or one fixed to his land, but proceeds on the principle that having knowledge of the rights of other it will prevent him from defeating such rights. Brewer v. Marshall, 19 N.J. Eq. 537.
The covenants in the deeds, standing alone, do not furnish adequate evidence from which the existence of a common and obligatory neighborhood scheme may be deduced. The variety of the covenants, and their inclusion in some deeds and omission from others, preclude the inference.
There is evidence that the parcels were sold upon representations that each would be restricted to one and two-family houses, not to be higher than two and a half stories, and it finds some support in the uniformity of the covenants in that respect, but it falls short of establishing a community scheme. Haas, the first buyer of a building lot, says Mr. Selvage, the president, told him, when he bought in 1911, that "they would allow only one or two-family houses to be built," and that a sign on the property read: "Lots for sale for one and two-family houses." Haas' deed contains no covenants, and though he says that Mr. Selvage promised to give him an agreement to that effect, he never did. It is observed that when Haas purchased an adjoining lot two years later he again took without covenants. And in the meantime the company had sold another, a third lot, without covenants. The next deed, in 1916, contains restrictions to one dwelling, not more than two and a half stories high, no flat roof, to cost not less than $3,500, with twenty-three foot set-back, the covenants to run until January 1st, 1925. In the next conveyance, in 1921, there were like covenants, except the minimum cost was $8,000 and the covenants to expire January 1st, 1930. Meantime, in 1919, the entire strip on *Page 573 
the south side of Lehigh avenue had been sold to one party by three deeds, restricted to a six-foot set-back and minimum cost, $7,500, and the number of houses was unlimited. Later in the same year another lot was sold with restrictions to two houses, set back fifteen feet and the minimum cost $6,000. In the four deeds the running of the covenants are without day. It cannot be said that up to 1921, with five of the nine conveyances to that time without covenants, or with covenants that have now expired, or are about to expire, and the remaining four with dissimilar covenants, there was any fixed plan adopted by the company, even for its own sake, in the sale of the lots, let alone covenants for the common benefit of owners and prospects. Indeed, it would seem that the covenants imposed depended upon the humor of the grantor. To that time we have but the meagre testimony of Mr. Haas, of a scheme by representations, and that is neutralized by the absence of covenants in his own deeds.
Thereafter the covenants were consistent, and it is the contention that they, in conjunction with the representations made by the company's officers, make out a community scheme from then on. Assuming that the facts prove the intent to thus create a general scheme, it was too late to be effectual. It broke down in the making. Lots on three of the four avenues of the community were already excluded. One lot owner, Haas, was at liberty to impair it practically, and now another man, and in 1930 a third, will hold his lot to do with it as it pleases him. It is not intended to hold that there could be no neighborhood plan with a fractional part of the area not included, if that be the arrangement, but to emphasize what is already obvious, that if the scheme is not universal of application, as the covenantors intend it to be, it would not be binding on any owner on the theory of mutual obligation and common benefit. "A general scheme of restrictions, to be effective and enforceable, must have certain characteristics. It must be universal — that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal, it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or *Page 574 
plan of this character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions, while others are, then a burden would be carried by some owners without a corresponding benefit. The burden follows the benefit, and where there is no benefit there should be no burden." Vice-Chancellor Fielder's concise statement of the law, approved by the court of errors and appeals in Klein v. Sisters of Charity of St.Elizabeth, 101 N.J. Eq. 761.
The uniformity of the later covenants indicates fixity of purpose, and one Moriarity, a builder, who bought quite a block in 1923, wanted to erect three-family houses and consent was refused, the president stating that the property "was restricted to two-family houses * * * in protection to the rest of the people that he had sold to." And to one Enderle, who offered to buy lots on Mapes avenue in 1923 if the lots were restricted to one-family houses, he replied that he could not do that in justice to the people to whom he had sold, and that what he was doing, had done and will do is "to restrict it to the same restrictions that applied to the Weequahic Park tract." Just why he should have refused the witness' request is difficult to understand, for other lots were restricted to one-family houses. That is all the related testimony. Another witness testified that her grantor, not the common grantor, told her that the property was all restricted, and for convenience a host of other owner witnesses were dispensed with upon a stipulation that they would give similar testimony. A number of other purchasers gave testimony that no representations were made when they bought, and the remaining twenty or more grantees from the common holder were not called. The impression is deep, that the company from its earlier days intended to restrict the height of the houses, and were the covenants of the enforceable type, enforcement in that respect would not be objectionable because the covenants in other respects were not uniform. Sanford v. Keer, supra. Selvage, whose private venture *Page 575 
it was, evidently had no ideas of his own about restrictions, except, perhaps, that structures on his small tract should harmonize with those of its big brother next door. The original conception, no doubt, was to conform the restrictions to those prevailing on the Weequahic Park tract, and for the same length of time, to January 1st, 1925. This is manifest from the first covenants, which expired on that date. The later covenants, though without limit, are to be regarded as in execution of that scheme and ceased to exist with the expiration of the scheme.
In the absence of a general scheme the complainants (a group of lot-owners) have no equities against the defendants, and it is immaterial whether the defendants took title free or encumbered by restrictive covenants, they being subsequent purchasers. We then have the situation dealt with in Beattie v. Howell,supra. But it does not follow that the covenantors have lost all advantages of the restrictions. As between themselves they may still be bound to compliance, each to subsequent purchasers from the common grantor, if that be the intent of the covenants.Leaver v. Gorman, 73 N.J. Eq. 129; see Sailer v. Podolski,82 N.J. Eq. 459.
The bill will be dismissed.