245 So.2d 609 (1971)
SILVER BLUE LAKE APARTMENTS, INC., a Florida Corporation, John Leisenring, Harold M. Diamond and Bernard Sandel, Petitioners,
v.
SILVER BLUE LAKE HOME OWNERS ASSOCIATION, Inc., a Corporation Not for Profit Existing under the Laws of the State of Florida, William M. DeLisa and Harris J. Buchbinder, Respondents.
No. 38967.
Supreme Court of Florida.
February 17, 1971.
Rehearing Denied April 5, 1971.
Mallory H. Horton, of Horton & Schwartz, Miami, and Kastenbaum, Mamber, Gopman, Epstein & Miles, Miami Beach, for petitioners.
Thomas H. Anderson and Karl Vance Hart, of Shutts & Bowen and Kimbell & Bailey, Miami, for respondents.
ROBERTS, Chief Justice.
This cause is before the court on petition for certiorari to review the decisions of the District Court of Appeal, Third District, in Silver Blue Lake Apartments, Inc. v. Silver Blue Lake Home Owners Association, Inc., Fla.App. 1969, 225 So.2d 557, certified to this court by the appellate court as one passing on a question of great public interest. We have accepted jurisdiction as *610 authorized by Section 4, Article V, Florida Constitution.
The facts are stated in the opinion of the appellate court and need not be repeated here in detail. Basically, the suit was concerned with the right of apartment-house tenants of the petitioner Apartments, Inc., one of the defendants below, to use a small man-made lake covering land now owned by the respondent Association, one of the plaintiffs below. The plaintiff is a non-profit corporation whose membership consists of owners of homes on the perimeter of the lake. It has adopted rules of safety for the use of the lake by boaters and others and polices the lake to enforce safety standards and to restrict its use to authorized persons.
The tract of land now covered by the lake and the tract now owned by the defendant Apartments, Inc., were formerly owned by one Benjamin Freeman in association with others. Some seven or eight years ago the water bottom was conveyed to the plaintiff Association in return for its home-owner members agreeing not to resist  as they had successfully done before  Freeman's application for a rezoning from residential to commercial of a pie-shaped tract owned by him, a small portion of which abutted the lake. The deed contained a clause restricting the use of the lake to members of the Association. Four years later Freeman sold the pie-shaped tract to Apartments, Inc., together with the few feet of water bottom that he had reserved in the deed of the water bottom to the Association. The deed recited that it was subject to restrictions of record but omitted the restrictive clause contained in the water-bottom deed. At the time of the instant suit, there were some 218 apartment units in service and some 81 under construction. The tract will accommodate even more apartment units. The use of the lake  or misuse, as found by the Chancellor  by the apartment house tenants resulted in the subject litigation.
The Chancellor found that the use of the lake by the apartment tenants unreasonably interfered with the rights of the other proprietors and should be enjoined under the rule of Duval v. Thomas, Fla. 1959, 114 So.2d 791. The appellate court agreed. However, the Chancellor rested his decree on an additional ground:  He found that the officers of Apartments, Inc. had actual knowledge of the clause restricting the use of the lake, referred to above, before purchasing the property from Freeman and had even applied for membership in the Association. He concluded that it would be inequitable, now that the apartment owners had reaped the benefit of the rezoning pursuant to the home owners' agreement with Freeman, to allow them to disavow the restrictive clause. On appeal, the decree was affirmed, but without discussion of the principle of law respecting such restrictive agreements.
In support of their petition here, it is contended on behalf of the petitioner-defendant Apartments, Inc. that it has an "inalienable right" to the use of "all its properties by all of its tenants" and that to deny it that right is to deny it the equal protection of the law. It is also contended that, since it was a stranger to the deed containing the restrictive clause referred to above, it cannot be bound thereby, even though it might have had actual notice as found by the Chancellor. Its position is stated as follows:  "The fact that the corporate petitioners' predecessor in title reaped some benefit from the conveyances to the corporate respondent by negating the objections of owners on the lake to a rezoning of its property is of no concern or benefit to the petitioners." Such an attitude of callous, almost cynical, indifference might be appropriate in a court of law; but in this case the rights of the parties were submitted to and decided by a court of equity. And the equitable principle applicable here  sometimes referred to as the doctrine of equitable servitude  is recognized in this state as in many other jurisdictions. See 20 Am.Jur.2d, Covenants etc., Sec. 26, p. 597, in which it is noted that the doctrine of equitable servitude "has now received wide acceptance in this country, *611 although there is no unanimity of opinion among the cases as to whether equity is enforcing the promise as a contract or as an incorporeal property interest in the burdened land; * * *".
The doctrine apparently originated in the English case of Tulk v. Moxhay (1848) 2 Ph. 774 (41 Eng.Rep. 1143) in which it was said that
"* * * the question does not depend upon whether the covenant runs with the land * * * if there was a mere agreement and no covenant, this court would enforce it against the party purchasing with notice of it; for if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased."
The rule is simply stated in Langenback v. Mays (Ga. 1950) 207 Ga. 156, 60 S.E.2d 240, as follows: 
"Equity will enforce a lawful restrictive agreement concerning land against a person who takes with notice of the contract. In such a case, the person violating the agreement, though not a party to it, is a privy in conscience with the maker."
The reason for the rule is apparent: "Obviously, plaintiff has no adequate remedy at law. If equity cannot grant relief, a covenantor need only convey the land to destroy today the covenant he made yesterday." Sun Oil Company v. Trent Auto Wash, Inc. (1967), 379 Mich. 182, 150 N.W.2d 818.
Whether a restrictive agreement is technically one "running with the land" is material in equity only on the question of notice, since if it runs with the land it is binding regardless of notice and, if not, the owner is bound only if he takes the land with notice. Appeal of J.C. Grille, Inc., 181 Pa.Super. 456, 124 A.2d 659. The sole test for the running of the burden in equity is the intention of the parties to impose a servitude upon the land as distinguished from a personal promise of the present owner. Thodos v. Shirk (1956) 248 Iowa 172, 79 N.W.2d 733. Other recent cases applying this equitable doctrine are Bouley v. City of Nashua, 1964, 106 N.H. 79, 205 A.2d 34; Murphey v. Gray, 84 Ariz. 299, 327 P.2d 751; Warren v. Protano, Inc., Sup., 155 N.Y.S.2d 686; Baldwinsville Federal Savings & Loan Ass'n. v. Burns Farms, Inc., 8 Misc.2d 127, 165 N.Y.S.2d 650; Wallace v. St. Clair, 1962, 147 W. Va. 377, 127 S.E.2d 742; Coomes v. Aero Theatre & Shopping Center, 1955, 207 Md. 432, 114 A.2d 631, citing 3 Tiffany, Real Property, 3d Ed., Sec. 861.
There can be no doubt that the doctrine of equitable servitude has been accepted and applied by courts in this state. In Osius v. Barton, 1933, 109 Fla. 556, 147 So. 862, 868, the court discussed the two theories upon which such restrictive agreements are enforced: (1) as contracts concerning the land, and (2) as servitudes or easements of land, and said:
"The theory adopted in this state is that the contract which embodies the restriction may be enforced against both the promissor and those taking from him with notice, thereby including amongst those who may enforce the obligation not only the promisee, but those who take from him and those in the neighborhood who may be considered as beneficiaries of the contract."
And in Vetzel v. Brown, Fla. 1956, 86 So.2d 138, we said that
"Such use restrictions have long been enforced by courts of equity against a grantee taking title with notice of the restrictions, without regard to the technicalities of law relating to covenants running with the land."
Accord: Frumkes v. Boyer, Fla. 1958, 101 So.2d 387; Hagan v. Sabal Palms, Inc., Fla.App. 1966, 186 So.2d 302; Tolar v. Meyer, Fla.App. 1957, 96 So.2d 554; Batman v. Creighton, Fla.App. 1958, 101 So.2d 587; Maule Industries v. Sheffield Steel Products, *612 Fla.App. 1958, 105 So.2d 798; Gercas v. Davis, Fla.App. 1966, 188 So.2d 9; City of Miami Beach v. Kline, Fla.App. 1966, 189 So.2d 503.
The Chancellor heard the testimony of the parties concerning the circumstances in which the restrictive clause was agreed to by the Association and by the predecessor in title of Apartments, Inc., and concluded that it was the intent and purpose of the conveyance and the restrictive clause to give the defendant Association control over the use of the lake insofar as the lands retained by Freeman were concerned. His finding was stated as follows: 
"To allow APARTMENTS, INC. and its tenants to have unrestricted use of the lake would deprive the ASSOCIATION of its beneficial use of the property in violation of the very intent of the parties at the time of the conveyance [of the water bottom]. The position of the parties has now changed. APARTMENTS, INC. has reaped its benefit of the bargain with the home owners. Its land has been rezoned and has been developed accordingly. To allow its tenants the free and unobstructed use of the lake will make it impracticable, if not impossible, for the home owners to use the lake. Such a result would be inequitable."
As noted above, the appellate court agreed with this finding, and so do we. Here, as in Vetzel v. Brown, supra, 86 So.2d 138, 140, the owner of the land should not, in equity and good conscience, be permitted to act in violation of the terms of the restrictive clause agreed to by its predecessor in title of which its officers had actual notice.
Since we are of the opinion that appellants are bound by the terms of the restrictive clause heretofore discussed, it is unnecessary at this time to consider whether excluding appellants' tenants from using the lake would otherwise be proper. However, the question certified by the District Court ought to be answered since it remains as a question of great public interest. In our view, as an abstract proposition, the right of owners of a portion of the bed (of an artificial lake, which is found as a fact from the evidence to be a non-navigable lake,) to rent their rights to use of the water surface to tenants of an apartment complex on the land including a portion of the lake bed, is only the right of lawful and reasonable use not detrimental to other owners or lawful users; such use may be held to be subordinate to valid deed restrictions, reservations, agreements or other title burdens.
The decision of the appellate court here reviewed having reached the correct conclusion that the decree of the lower court be affirmed, the writ heretofore issued in this cause should be, and hereby is, discharged.
It is so ordered.
CARLTON, ADKINS, McCAIN and DEKLE, JJ., concur.
DREW, J. (Retired), concurs in part and dissents in part with opinion.
ERVIN, J., dissents with opinion.
DREW, Justice: (concurring in part and dissenting in part).
I concur with the majority opinion insofar as it affirms on the principle of equitable servitude the trial court's finding that Silver Blue Lake Apartments, Inc., and its tenants are bound by the clause restricting use of the lake to members of the respondent Association.[1] However, *613 the majority opinion fails to resolve or treat in any manner the sole issue decided by the district court, whose opinion has been certified to this Court as one passing on a question of great public interest. I feel that it is incumbent upon this Court to reach and resolve the issue in the opinion certified, especially inasmuch as the district court's statement of the law is, in my opinion, patently erroneous.
The trial court found that individual property owners' use of Silver Blue Lake was being unreasonably interfered with by tenants of Silver Blue Lake Apartments. It held that "only the persons owning portions of the lake bed are entitled to use the lake and that the owners of the apartments can not extend this right to use the lake to each of its tenants." This holding was premised upon the court's interpretation of Florida common law relative to use of nonnavigable lakes.
As an additional but expressly unnecessary support for its holding, the trial court found that the restrictive clause ("reservation") contained in the deed of lake bottom property to the Association was ambiguous. The court attributed to it the effect of restricting lake use to those who apply for membership in and are admitted to the Association, and further interpreted the clause to mean that "any purchasers of the retained lands other than individual home owners would not have any rights to use the surface waters of the lake" [emphasis added].
The district court has affirmed the trial court's judgment solely upon what the district court deems controlling precedent in the Duval v. Thomas[2] cases, pertaining to use of nonnavigable lakes by abutting property owners. The district court expressly refrained from any discussion or ruling upon the effect of the "reservation" on the property conveyed to the Association.
The majority opinion of this Court affirms the district court on the sole basis of the effect of the reservation in the deed coupled with the principle of equitable servitude, finding it unnecessary "to decide whether or not the right to use the lake would be otherwise proper." It is precisely this latter point that the district court thought sufficiently important to certify for our disposition.
The district court has ruled that under general Florida water law apartment tenants of a riparian lake bottom owner derive no right through the owner to use the waters of a non-navigable lake. This rule should not be allowed to remain on the books, for it has never been and should never be the law in this state. To leave this rule standing could well lead to financial disaster for countless apartment projects located on lakes throughout the state that in whole or in part depend upon lake privileges to lure tenants.
I agree with the district court's statement that pursuant to the decisions in the Duval v. Thomas[3] cases, injunctive relief is available to a lake bottom owner when the owner's lawful use is being unreasonably interfered with.[4] But the trial court paints with too broad a brush, just as it did in the similar case of Florio v. State ex rel. Epperson.[5] The facts in Florio appear in the opinion as follows:[6]
"Factually, it appears that the complaining parties are riparian owners of property around and running into Egypt *614 Lake, a lake of approximately 75 acres. The defendants, Robert and Fran Florio, own and operate as a 29 acre area on Egypt Lake known as Ralston Beach. The Florios lease a portion of this land to one of the defendants, McDonald, who for two years had been operating a water skiing school on Egypt Lake. Another defendant, the Tampa Ski Bees, is an unincorporated association having members who ski on the lake.
"The plaintiffs as well as the defendants have engaged in water skiing on the lake. The plaintiffs objected to such things as noise, annoyance, and interference with the rights of residents of the community and their visitors in their use of the lake, erosion of the beaches, and domination of the lake by the defendants through the use of high powered tow boats and through negligent and reckless skiing to the extent that ordinary use and occupancy of the lake was rendered dangerous and unsafe for fishing, swimming, and skiing, thus resulting in a dangerous condition annoying and injuring the health of the community and physically jeopardizing plaintiffs and their children in use of their own property."
The district court in Florio correctly stated the general law applicable to this cause as well as to the facts then before it, and reversed an injunction banning all of defendant's skiing operations:[7]
"The rights of riparian proprietors to the use of waters in a non-navigable lake are equal, and each riparian owner has the right to use the water in the lake for lawful purposes, so long as his use is not detrimental to the rights of the other riparian owners. Except as to the supplying of natural wants, including the use of water for domestic purposes, it is immaterial what use is made if that use is lawful and reasonable.
* * * * * *
"Since the injunctive decree rendered by the chancellor was wrongfully discriminatory and too broad in scope, it is subject to being, and should be, modified so as to provide reasonable use by all parties of their riparian rights under appropriate regulations, to the end that the defendants are not deprived and excluded from reasonable legitimate use under the circumstances. * * *"
There is no justification, without reference to the "reservation" present in this cause, for depriving an apartment owner of the full benefit and use of his property enjoyed by every other riparian lake bed owner. The "reasonable use" of nonnavigable waters is a broad concept encompassing numerous aquatic activities and uses to which every riparian lake bed owner is entitled. By depriving the lakeside apartment owner of "reasonable use" of the lake waters, we are arbitrarily discriminating against him and unconstitutionally depriving him of the full use of his property.
If the children, guests, relatives and tenants of an individual home owner enjoy lake privileges through the owner, then certainly the apartment owner and his tenants can be treated no differently and should enjoy the same right to use the lake in a reasonable manner and in reasonable numbers. If, as here, the lake is small and the number of apartment tenants is large, responsibility should be placed upon the apartment owner to see that his tenants' lake activities do not interfere with other property owners' reasonable use of the lake. Certainly the private home owners' interests and the rights of the apartment owner and his tenants can normally be accommodated without resort to a total ban on tenants' use of the lake.
Inasmuch as the trial court's decree was obviously based in part upon an erroneous concept of law, I would quash the district court opinion, with directions to (1) affirm the trial court's finding that the "reservation" *615 applies to Silver Blue Lake Apartments, Inc., and its tenants, (2) vacate that portion of the judgment predicated upon the point of law herein discussed, and (3) remand for further proceedings not inconsistent herewith.
ERVIN, J., concurs in part with opinion.
ERVIN, Chief Justice (dissenting).
I agree with Mr. Justice Drew's view that under the law applicable to non-navigable waterways, petitioner, Silver Blue Lake Apartments, Inc., as an owner of a portion of the bed of Silver Blue Lake, possessed coequal rights with other bed owners to enjoy reasonable use of the overlying waters of the entire lake. Duval v. Thomas, Fla. 1959, 114 So.2d 791. I further agree that the right possessed by Apartments, Inc., inures to the benefit of its tenants, subject, of course, to the doctrine of reasonable use, the confines of which, under the circumstances here presented, do not warrant a total ban on the tenants' use of the lake waters. See Florio v. State ex rel. Epperson, Fla.App. 1960, 119 So.2d 305.
I not only agree with Justice Drew's conclusion that reasonable use of the waters of the lake inures to tenants of Apartments, Inc., under the principles stated in Florio v. State, supra, but for the further reason that upon reading the record I am in doubt concerning whether Silver Blue Lake is non-navigable in status and subject only to the private use of the respondent Association and its members.
The trial court in its order found that Silver Blue Lake is a man-made, non-navigable lake, covering about 80 acres, which resulted from the excavation of limerock over a period of years. Although the record is not clear on this point, apparently the lake has existed in its present size at least for a period of in excess of ten years. There is evidence in the record that seems to indicate Silver Blue Lake, due to its size, water depths and aquatic qualities, is suitable for general recreational use, including boating, skiing and swimming, and in fact was used for such purposes by the public generally prior to the creation of the respondent Association for the purpose of limiting the use of the lake exclusively to its members. It appears also that there are now some 218 apartment units in service bordering the lake and some 81 more apartments are under construction around the lake. In addition, there are a number of private residences bordering the lake. Thus it appears an increasing number of persons own or occupy said housing facilities in proximity to the lake which may be evidence that the original owners in developing and promoting the lake-side housing areas augmented appreciably the number of lake-side residents and recreational users of the lake and in doing so may have in effect abandoned or failed consistently to follow the original plan or scheme of preserving the lake for the private use of the Association and its members, but rather, instead, have opened it up and dedicated it for non-exclusive use by numerous persons having access thereto.
For reasons hereinafter discussed, the foregoing evidentiary considerations are highly relevant to the application of what I consider to be proper criteria for resolving the controlling question of the public versus private character of the instant lake.
A determination that a waterbody is navigable, as opposed to non-navigable, provides the public, of course, with the right to free and reasonable use of its waters, including swimming and bathing, for recreational as well as commercial purposes. Baker v. State ex rel. Jones, Fla. 1956, 87 So.2d 497. It stands to reason that the paramount rights accruing to the public generally from the navigable status of the waterbody would prevail over and render ineffective any attempt by the upland or bottom owners, as the case may be, to restrict or otherwise impair public use of the waters in question. As applied to the *616 present case, the evidence may warrant a finding that Silver Blue Lake, although created incidentally by limerock excavations, acquired a navigable status because of general public recreational use prior to the efforts of the promoting developers or the various owners of the lake bottom and surrounding lands to fashion a private lake facility through the creation of the Respondent Association and including in the conveyance to it of the lake bottom property the so-called exclusive reservation of the use of the lake waters on behalf of the Association. Under such circumstances, although right of access to the lake may in some way be restricted by deed reservations, such reservation may be held not to restrict or thwart the public right to reasonable recreational use of the water of said lake, assuming the public could gain lawful access thereto.
In a different but related context, it may be found that even though the plan of action of the Association and its members, with perhaps temporary success, was pursued with the intent and design of maintaining the lake as a private recreational facility, the increased and enlarged use of the lake by numerous persons who came at the developers' behest to reside along the lake in the apartments and homes could have changed its character under principles of abandonment or dedication to a public navigable lake. Under these conditions, it likewise follows the so-called deed reservation would be without force and effect so far as restricting the public's right to reasonable use of the lake, assuming lawful access thereto. Thus, even though Silver Blue Lake was artificially created, the criteria for determining its public or navigable character as opposed to its private, non-navigable status, takes on determinative significance in resolving the instant controversy. These criteria have been examined and are discussed immediately hereinafter.
Under the English common law, at least in its early development, the sole criterion for determining navigability was the ebb and flow of the tide. Tidal waters were deemed navigable and waters not affected by the tide were considered non-navigable.
The tidal test of navigability, although a creature of the common law, soon proved unsuitable as a meaningful criterion for determining navigability in most American jurisdictions. In the American states navigibility came to mean navigability in fact, and the test generally applied was whether the waterway in question was actually traversible or susceptible of being used for public purposes, generally stated as commercial purposes. However, as seen from the following passage, the evolution of the purposes to which the waterway may be suitable in order to be navigable is still underway:
"Most of the definitions of `navigability,' while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation be by boats at all, yet seem to convey the idea that the water must, for the purposes of navigability, be capable of some commercial or pecuniary value as distinguished from boating for mere pleasure. * * * There is, however, much authority for the view, which has been spoken of as being the better rule, that it is not necessary that the water be capable of commerce of pecuniary value, and that boating or sailing for pleasure should be considered navigation as well as boating for mere pecuniary profit. And the expression is frequently used that navigability for pleasure is as sacred in the eye of the law as navigability for any other purpose. It has been held that the term `navigable' as used in a statute relating to the ownership of submerged land, includes waters which are naturally available for use by the public for boating, fishing, etc., although they may not be susceptible of use for general commercial navigation." 56 Am.Jur. Waters, ¶ 181.
Although Florida, a state noted for its recreational orientation, has not as yet expressly joined those jurisdictions adhering *617 to the view that capacity for navigation of a waterway or lake for general recreational purposes is a significant criterion for determining navigability, this Court's decision in Baker v. State ex rel. Jones, supra, appears to open the door for the adoption of such a rule in this State.[1]
In the present case, although the lake was artifically created, there is evidence in the record suggesting a finding of navigability from the standpoint of the lake's suitability for recreational and boating activities. Thus, absent overriding considerations springing from its artificial origin, it seems to me this Court might be hard pressed in the face of the forward trend of the law in this State and other jurisdictions in a test case requiring a direct adjudication concerning the public or private character of the lake, to approve the trial court's determination in this case that the lake is non-navigable.
What then is the persuasive force of those considerations springing from the artificial origin of Silver Blue Lake which militate against a determination of its character as a public navigable waterbody?
There is a dearth of authority in this State as well as other jurisdictions relevant to the question of the acquisition of public rights in wholly artificially created waterways. A brief but enlightening summary of the undeveloped status of this area of water law appears in Maloney, Plager and Baldwin, Water Law and Administration, The Florida Experience, 61 (1968):
"The rights of the public in an artificial waterbody large enough to be characterized as navigable, yet wholly enclosed within a privately owned tract of land, are uncertain. It is arguable that the private owner, having expended the effort to create the artificial waterbody, should have exclusive enjoyment. Also, it may be noted, such a rule would not deprive the public of enjoyment of any rights in the waterbody that they had previously possessed, because the artificial waterbody did not previously exist. On the other hand, public rights in navigable waters generally are well recognized, and private ownership of the bed is not inconsistent with public rights in the use of the water."
As the foregoing passage clearly suggests, public rights arising incident to the navigable character of a waterbody, whether artificially or naturally created, are not theoretically inconsistent with the fact that the bed of the waterbody may be privately owned. However, as equally suggested above, there are certain policy considerations, which, if applicable, strongly favor an exclusive, non-public use of artificially created waterbodies, the characteristics of which otherwise would render them navigable. It would indeed be unconscionable to legally sanction the accrument of public rights in an artificially created but otherwise navigable waterbody, the development of which was perfected through the resources of the owner or owners of the underlying land pursuant to a plan or design to exclusively limit the benefits of the project to a recognized non-public class or group. In such a situation, if no considerable participation of the general public was involved in the development and use of the waterbody originally, and if there has been no lapse in or abandonment of an original plan to exclusively limit the use of the waterbody to the designated non-public class, then it would appear reasonable to conclude subsequent acquisition of public rights in the waterbody so developed *618 had not occurred. To reason to the contrary easily could be considered as a violation of the constitutional prohibition against the taking of private property without just compensation.
However, if for one reason or another there is an absence of or departure from the foregoing conditions a sufficient and legitimate basis may arise for the recognition of public rights in the artificially created waterbody. Where, for example, there is acquiescence in the use of the waterbody by persons not members of the designated exclusive group, principles of dedication or abandonment may operate to create public rights therein.[2] Also, for example, where an artificial waterbody was not specifically developed originally pursuant to a given plan or design to exclusively limit the public use thereof and where, as suggested by certain evidence in the instant case, the scheme for exclusively limiting the use of the waterbody was advanced by developers subsequent to the actual creation of the man-made lake and subsequent to its use by members of the public for recreation, there may be a weakening of those policy considerations which favor private ownership of the waterbody to the extent that recognition of public rights therein may be warranted by virtue of countervailing considerations, including the anticipated increased pressure in this state for the availability of more water sources for public recreational purposes. See Maloney, Plager and Baldwin, supra, at 411-412, 415-416.
The record in the present case lacks substantial evidence bearing on the existence or nonexistence of the criteria above enumerated because the questions of navigability and public rights in the lake were not contested issues and the trial court's bare finding on this question has apparently been acquiesced in and accepted by the petitioner although the public well may be a substantially interested party in this controversy so far as concerns the navigable character of Silver Blue Lake  a party, however, that was not represented nor heard from in the trial court. Nevertheless, the trial court has the duty sua sponte to protect rights of the public in the lake. Stein v. Brown Properties, Fla. 1958, 104 So.2d 495.
Because there is the possibility Silver Blue Lake may be navigable in fact and open to the public under the criteria and factual considerations above discussed, I consider it appropriate therefore, not to compound or maximize the questioned restrictions on the use of the lake by denying to Apartments, Inc. tenants and their families recreational use of the lake in the instant case.
ADKINS, J., concurs in part.
NOTES
[1] The clause appearing in the instrument deeding a large portion of the lake bottom to the respondent Association reads as follows: "RESERVATION: All home owners or tenants of home owners owning a home on the perimeter of Silver Blue Lake shall be entitled to apply for membership in Silver Blue Lake Home Owners Association and upon being approved and accepted for membership or associate membership of Silver Blue Lake Home Owners Association such owner or tenant shall be entitled to use that part of Silver Blue Lake owned by the Association provided that such use shall be in accordance with the By-laws of the Association, its successor or assigns."
[2] 114 So.2d 791 (Fla. 1959), and 107 So.2d 148 (2nd Dist.Ct.App.Fla. 1958).
[3] Id.
[4] See also Taylor v. Tampa Coal Co., 46 So.2d 392 (Fla. 1950).
[5] 119 So.2d 305 (2nd Dist.Ct.App.Fla. 1960).
[6] Id. at 307-308.
[7] Id. at 310.
[1] "As to the second question  whether evidence of use for pleasure boating is significant, with or without commercial use, to establish navigability  the language of the Florida Court quoted above, and the language of the court in such recent cases as Baker v. State ex rel. Jones, equating navigability with the possibility of use `for purposes common or useful to the public,' indicates a willingness to include recreational boating in the test of navigability * * *." Maloney, Plager and Baldwin, Water Law and Administration, The Florida Experience, 39 (1968).
[2] "An artificial condition of a stream or other body of water may become a natural or normal condition as respects public rights. It has been stated, however, in this connection, that it usually requires conduct amounting to dedication or abandonment to give the public rights in an artificial condition of a body of water created by private enterprise, for the reason that the public right in a stream is ordinarily measured by the condition of the stream in its natural state." 56 Am.Jur., Waters, § 244.