James H. Walden et al., complainants-respondents,

*v.*

Pines Lake Land Company et al., defendants-appellants.

[Decided September 22d, 1939.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"Complainant James H. Walden and defendant Pines Lake Land Co. owned adjoining tracts of wild land in Wayne township. Walden's tract comprised about ninety-nine acres and

a brook ran through it in a southerly direction, to and through said defendant's tract. The Land Co. proposed to develop its tract and in December, 1926, caused a map to be made showing a lake to be formed by damming the brook waters at a point on the southwesterly line of its tract, which map disclosed that the lake, at its northerly end, would overflow a portion of Walden's tract. The Land Co.'s proposed development included a road to be constructed around the lake (afterward called Pines Lake Drive) over its and Walden's lands. It entered into an agreement with Walden, dated January 25th, 1927, whereby Walden consented to the flooding of the needed portion of his tract and to pay part of the expense of constructing the dam, in the proportion that the number of feet frontage of his land on the proposed lake bore to the entire lake shore front. The agreement is silent as to how the cost of Lake Drive construction should be borne. The dam and road were constructed and Walden paid $4,786.80 as his share of the cost of the dam and $11,171.81 as his share of road construction. The lake as formed by the impounded waters of the brook covers one hundred and forty-seven acres and has a shore line of seventeen thousand four hundred feet. Of the total lake area thirteen acres submerge Walden's land and his remaining upland has a frontage of three thousand feet on the lake extending back several hundred feet. The Land Co. subsequently made conveyance to Pines Lake Corp. of certain of its lands, together with the grantor's interest in its agreement with Walden, and Walden conveyed his upland and land under water to Peoples Bank and Trust Co. by deed dated July 18th, 1928, in trust with power of sale, under which the Trust Co. on June 8th, 1938, entered into a contract of sale to one Stead. In July of the present year the Land Co. or the Lake Corp. placed a string of buoys anchored to concrete bases in the lake, along what was the old dividing line between the tracts owned by Walden and the Land Co. and gave notice that no one could pass over the lake from Walden's end beyond the line of buoys, and that neither Walden nor any one succeeding to his interest, could use that portion of Lake Drive constructed over the Land Co.'s land, or use a road, known as Hemlock Road,

which had been constructed by the Land Co. for the purpose of ingress and egress between Lake Drive and a public highway. In the instant case Walden and his wife, Peoples Bank and Trust Co., and Stead join as complainants (and will hereafter be referred to as Walden), against Pines Lake Land Co. and Pines Lake Corp. (hereinafter referred to as defendants), praying that the agreement of January 25th, 1927, be reformed to show that all covenants therein for Walden's benefit are also for the benefit of his heirs and assigns; that defendants be restrained from interfering with Walden's use of the entire lake and the use of Lake Drive and Hemlock Road; that defendants be restrained from maintaining the buoys and bases in the lake and be decreed to remove them and that they pay such damage as Walden has sustained through defendants' interference with complainants' rights.

"The defendants now admit Walden's right to have the agreement of January 25th, 1927, reformed as prayed for and also admit the right of Walden, his heirs and assigns, to use Lake Drive for its entire length but they deny any right in Walden to the use of Hemlock Road or of the waters of the entire lake.

"As to the waters of the lake, the title thereto is exclusively in the owners of the soil beneath the waters and Walden can have no right to the use of any portion of the lake above defendants' soil, unless he can show a grant, easement or license from defendants (*Cobb* v. *Davenport, 32 N. J. Law 369; Albright* v. *Cortright, 64 N. J. Law 330; Mitchell* v. *D'Olier, 68 N. J. Law 375*), and his right to the use of Hemlock Road must similarly be based on grant, easement or license from defendants. At the hearing of the case the agreement of January 25th, 1927, was put in evidence and nothing in the testimony of Walden's witnesses is of much assistance in determining the questions to be considered. The defendants offered no testimony and, as stated in their answer to the bill, stand on said agreement and on a subsequent agreement entered into between the parties (to which reference will be made hereafter) as fixing the rights of the parties to this suit.

"Reference is therefore made to the agreement of January

25th, 1927, first for determining Walden's claim to the use of Hemlock Road. That agreement recites that Walden and defendant Pines Lake Land Co. are the owners of adjoining tracts of land and for the better and more convenient development of land adjoining the proposed lake (which means development of Walden's land as well as defendants') it is necessary to construct a road around the lake, and by the agreement Walden granted to the Land Co. a perpetual right of way over his land for a road around the lake, which road the agreement states, is to connect with any main road or roads the Land Co. may thereafter construct and the Land Co. expressly granted to Walden the right to use such main road or roads over its lands thereafter to be constructed. The agreement made a well defined distinction between Lake Drive and main roads, and Hemlock Road is a main road thereafter constructed by defendants, leading from Lake Drive to a public highway and is therefore, within the terms of the agreement, a road the use of which defendants granted to Walden in addition to Lake Drive.

"In claiming the right to use the entire lake, Walden does not claim as a riparian owner whose lands bound on the lake, but as an owner of a dominant tenement having rights over land of a servient tenant under an easement or privilege granted him or growing out of the agreement of January 25th, 1927. That agreement and a subsequent agreement of June 28th, 1928, show that Walden and Pines Lake Land Co. were desirous of opening up and developing their lands for dwelling sites. To make the land attractive, the Land Co. proposed that a dam forty feet high be constructed on its property to impound brook waters and thus form a lake one hundred and forty-seven acres in area and that a road be constructed around the lake, and the Land Co. invited Walden to join in the enterprise. He consented and by the agreement of January 25th, 1927, donated without remuneration, a right of flowage over so much of his land as was necessary for the purpose and agreed to pay his proportionate share of the cost of the dam and did contribute to the expense of the road. That agreement does not, in explicit terms, define or limit the rights of either party in the use of the lake over the

lands of the other, but it is obvious that creation of the lake would be of no benefit to Walden, as owner of more than a half mile front thereon, in the sale of his land if his use of the lake was to be restricted to a cove of thirteen acres immediately in front of his upland, and the agreement recognizes this as a fact in a recital therein that 'the construction of said dam and the over-flow of said lands [Walden's] will create a lake, as shown on said map and will be of benefit to the remaining lands of the said James H. Walden' and thereafter the agreement provides that 'The recitals hereinbefore mentioned and herein contained are hereby made part of this agreement.' I conclude that it was the intention of the parties as evidenced by the nature of the venture in which they were about to engage and as appears from said agreement, that each should have an easement or license to use the waters of the lake above the soil owned by the other, which privilege should attach to their respective lands, and that Walden having been led into giving the use of a portion of his land for the purpose of making the lake possible and into contributing part of the cost of its creation, defendants are estopped from denying his right to use the entire lake. The defendants offered no testimony or evidence to throw light on a contrary meaning or intent of the agreement. They merely argue that because it does not explicitly define Walden's rights, it should not be construed as giving him the use of a lake of one hundred and forty-seven acres when he contributed to its creation but thirteen acres and a relatively small part of the cost of the dam; but the lake could not have been created without Walden's consent to overflow his lands, nor could a drive around the lake, of manifest advantage to defendants in the sale of their property, have been constructed without his permission to pass over his lands.

"That the intent and spirit of the agreement of January 25th, 1927, was to attach to Walden's land the right of use of the entire lake is also to be gathered from a subsequent agreement entered into June 28th, 1928, between Walden and Pines Lake Corp., which was preceded by a map prepared by the Lake Co., dated June 1st, 1928, showing the lake and also Walden's upland and defendants' lands subdivided into

parcels or plots. There is nothing on the map to indicate that the whole lake is not open to use by owners of the lands shown thereon. The agreement recites that it is the desire of the parties to protect each other for two years by restricting their land on Lake Drive to certain purposes and it provides that Walden will place in his contracts and deeds, restrictions against business uses and against the erection of structures for use other than private single family residences, except a boathouse, on each plot, and the Land Co. bound itself to similar restrictions. This agreement again shows the desire of the parties to develop and market their lands for dwelling purposes and the reference therein to boathouses on Walden's land, is defendants' recognition of Walden's right to the use of the entire lake, because why else should the defendants be concerned with how many boathouses Walden built on each of his plots if the occupants thereof could not boat on the whole lake. And it would be of no practical value to Walden's land to erect any boathouses if boats were limited to the use of thirteen acres of water. The map of June 1st, 1928, shows twenty-five or more separate building plots on the Walden tract fronting on the lake. Can it be said that the parties thought Walden could market his plots with a boathouse built on each, from which twenty-five or more boats would emerge for a morning or afternoon row on a thirteen-acre body of water?

"The complainants will be granted a decree reforming the agreement of January 25th, 1927, so as to provide that the benefits therein for Walden shall enure to his heirs and assigns; also a mandatory injunction directing defendants to remove the buoys and the anchorages placed by them in the waters of the lake; also an injunction restraining defendants from interfering with Walden, his heirs and assigns, in their free use of waters of the entire lake for ordinary purposes such as boating, bathing and fishing and from interfering with the free use by Walden, his heirs and assigns, of Lake Drive and Hemlock Road.

"The question of damages claimed to have been sustained by complainants as a result of defendants' interference with their rights was not thoroughly presented or contested, it

seeming to be the desire of the parties that such rights should first be ascertained and determined; moreover on this question defendants, if they desire, are entitled to a trial by jury. The complainants' prayer for relief under this head will be denied without prejudice to their right to bring an action at law for such damages."

*Messrs. Davies & Davies,* for the appellants.

*Mr. Randal B. Lewis,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion delivered by Vice-Chancellor Fielder in the court of chancery.

*For reversal*—None.