433 So.2d 1202 (1983)
Herbert C. ANDERSON and Joan Anderson, Petitioners,
v.
Sam BELL, George Bell and James E. Estes, Respondents.
No. 61979.
Supreme Court of Florida.
June 9, 1983.
W.J. Oven, Jr. of Oven, Gwynn & Lewis, Tallahassee, for petitioners.
Jerome M. Novey of Frates & Novey, Tallahassee, for respondents.
ADKINS, Justice.
We have for review a decision of the District Court of Appeal, First District, Anderson v. Bell, 411 So.2d 948 (Fla. 1st DCA 1982), which expressly and directly conflicts with a decision of the second district. Publix Super Markets, Inc. v. Pearson, 315 So.2d 98 (Fla. 2d DCA 1975), cert. denied, 330 So.2d 20 (Fla. 1976). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
The facts which were stipulated to by counsel are as follows: The plaintiff below, Anderson, purchased a tract of land in 1965 from John Swisher. A small non-navigable creek traversed from north to south through the property. Anderson owned all lands contiguous to the creek, and it is not asserted that defendant had any interest in the water in its natural state. The plaintiff excavated the lowlands and constructed an earthen dam which resulted in a lake of substantial size. The construction, which began in 1966 or 1967, was completed in 1975.
As a result of the lake's creation, several parcels of land surrounding the lake were partially flooded. One of the flooded parcels was owned by Jessie Lewis and Madeline Watson who subsequently sold the tract to Sam Bell (defendant below). Prior to selling the land, Lewis and Watson brought an action against Anderson for damages incurred to their land as a result of the partial flooding. That action resulted in a settlement agreement whereby Lewis and Watson conveyed a flowage easement to Anderson in exchange for $10,000.
The easement, which describes the portion of land at issue, gives Anderson the right and privilege to flood the land, but expressly reserves title and beneficial use of the lands (except for the flowage rights) to the grantor. The easement also expressly reserves the grantee's right to discontinue the flowage at any time.
The instant action was brought by Anderson against Sam Bell and two other individuals (who were guests of Bell's) to enjoin them from fishing and boating upon the surface waters that lie above the bottom land owned by Anderson. Anderson does *1203 not contend, however, that Bell is precluded from using the lake surface above the land owned by Bell.
Although exact dimensions are not contained within the record, a scaled aerial photograph, which was stipulated as accurate by counsel, has been roughly sketched and appears as an appendix to this opinion. It reveals that the portion of bottom land owned by Bell appears to be over one acre. This amounts to only a small relative portion of the total lake area. (See Appendix).
The trial court found for Bell, and refused to enjoin his use of the entire lake for fishing and boating. The first district affirmed, holding that there is no distinction between natural lakes and man-made lakes for purposes of determining the respective rights of adjoining landowners. They found that our decision in Duval v. Thomas, 114 So.2d 791 (Fla. 1959), was applicable in both cases, and that an adjoining landowner is entitled to the reasonable lawful use of the entire lake. Id. at 949.
The cases on this issue, particularly in Florida, are somewhat limited. However, we find several Florida decisions that are relevant, and believe a brief discussion of them is helpful.
In Osceola County v. Triple E Development Co., 90 So.2d 600 (Fla. 1956), the plaintiff brought a condemnation action against the defendant to acquire a right-of-way to two lakes situated entirely within the bounds of defendant's property. We held that a "lake or pond entirely within the boundaries of a single tract of land belongs to the owner of the land as an appurtenant thereto." Id. at 602. Because the public had no necessity for the access, the condemnation right was denied.
In Duval v. Thomas, 114 So.2d 791 (Fla. 1959), the Court was asked to determine the relative rights of two or more people who owned portions of the bottom land in a lake. The Court distinguished Triple E as only applicable when the lake is owned entirely by one landowner so that it is "impossible for anyone to reach it except by trespassing." Id. at 793. The Court also stated that the Triple E decision amounted to a recognition of elements of both the civil and common law doctrines in that a lake could actually be exclusively owned. However, the Court chose to adopt the civil doctrine when ownership of the bottom lands vested in more than one person. This rule allows each landowner, who owns portions of the bottomlands, to the reasonable use of the lake which includes fishing, swimming and boating. The Court in Duval took judicial notice of Florida's tourist industry of which fishing and boating are an important part, and stated that a contrary rule would result in immeasurable damage. Id. at 795.
The Duval decision was not expressly limited to natural lakes nor extended to man-made lakes. Therefore, the respective rights of contiguous landowners in a man-made lake remained unanswered.
In Silver Blue Lake Apartments v. Silver Blue Lake Home Owners Association, 245 So.2d 609 (Fla. 1971), the Court once again was called upon to determine the rights of parties in a non-navigable lake. In this case, however, the lake involved was man-made. The apartment owner had purchased the lakefront land, which included three feet of bottom land, from Freeman. Freeman was also the previous owner of the remaining lake bottom land. However, he had conveyed this land to the homeowners association. The deed from Freeman to the homeowners association contained a restriction limiting use of the lake to the homeowners association members. The subsequent deed from Freeman to the apartment owners did not mention the restrictive clause in the previous deed; however, it was expressly subject to restrictions of record and the trial court found that the apartment owner had actual notice of the restriction. The Court held that the restriction was enforceable under the doctrine of equitable servitudes notwithstanding the fact that the apartment owner was not privy to the restrictive contract. Therefore, the apartment owner and his lessees could be properly enjoined from beneficial use of the lake. Although the decision was founded upon the doctrine of equitable servitudes, the Court also answered a certified *1204 question from the district court concerning the tenants' rights to use the lake absent the servitude. The Court stated:
In our view, as an abstract proposition, the right of owners of a portion of the bed (of an artificial lake, which is found as a fact from the evidence to be a non-navigable lake,) to rent their rights to use of the water surface to tenants of an apartment complex on the land including a portion of the lake bed, is only the right of lawful and reasonable use not detrimental to other owners or lawful users; such use may be held to be subordinate to valid deed restrictions, reservations, agreements or other title burdens.
Id. at 612. This language formed the basis for the plaintiffs' argument in Publix Super Markets, Inc. v. Pearson.
In Publix, a dispute arose over the respective contiguous property owners' rights in an artificial water body. The water body was formed as a result of phosphate mining which left large pits that became filled with water and assumed the characteristics of a large lake (approximately 47 acres). The water-body was shaped like a hand with five elongated "fingerlike" portions which connected at one end. The plaintiffs in that case owned property which extended into part of the easternmost pit on which they had built homes of substantial value. The complaint surfaced when the defendant, Publix, attempted to landfill portions of the western pits in order to construct a shopping center on the property. There was no contention that Publix did not own the land where the excavation was planned, nor was it contended that the excavation would cause an ecological disruption to the remaining waters. The only argument by the landowners was that, as riparian owners on this body of water, they enjoyed the right to the beneficial use of the surface waters of the entire body for fishing and boating.
The district court held that the plaintiffs had no riparian rights in the water, and could not enjoin Publix from filling in the lake. Although the court did not articulate any specific policy reasons for the natural/artificial dichotomy, they did indicate that the holding was in accordance with the general rule. 315 So.2d at 99 n. 2. The court distinguished the Silver Blue Lake case without addressing the aforementioned language, thereby limiting the Duval holding to cases involving natural watercourses.
The Silver Blue Lake dicta is, admittedly, subject to various interpretations. However, we believe the proper interpretation is that the holder of a leasehold estate enjoys the same rights to the use of an adjoining water body as the landlord  lawful and reasonable use. The Silver Blue Lake Court did not expressly hold, nor was the question presented, whether the owner of a portion of the lakebed on a non-navigable man-made lake has the same rights as if it were a natural lake. The question of what is an actual lawful use is the subject of the decision in the case sub judice, and is properly decided only when the issue is squarely presented to the Court.
For reasons that we will articulate, we now hold that the owner of property that lies adjacent to or beneath a man-made, non-navigable water body is not entitled to the beneficial use of the surface waters of the entire water body by sole virtue of the fact that he/she owns contiguous lands.
At the outset we note that this is the established rule in other jurisdictions as well as the common law. See Brasher v. Gibson, 101 Ariz. 326, 419 P.2d 505 (Ariz. 1966); Great Hill Lake, Inc. v. Caswell, 126 Conn. 364, 11 A.2d 396 (Conn. 1940) (rule implicit in holding); Thompson v. Enz, 379 Mich. 667, 154 N.W.2d 473 (Mich. 1967) (see also authorities cited within); Walden v. Pines Lake Land Co., 126 N.J. Eq. 249, 8 A.2d 581 (N.J. 1939) (absent an easement, no right to use of waters); 3 H. Farnham, The Law of Waters and Water Rights, § 827B (1904) [hereinafter Farnham, Water Rights]; Maloney, Plager, Baldwin, Water Law and Administration, The Florida Experience, 63 (1968) [hereinafter Maloney, Water Law] (landowner of land bordering on artificial water body is not entitled to riparian rights by virtue of the fact that his land borders it); Evans, Riparian Rights In *1205 Artificial Lakes and Streams, 16 Mo.L.Rev. 93, 106 (1951) (although riparian rights attached to natural water courses at common law, they do not attach to artificial courses and conditions) (citing 2 Washburn, Real Property § 1294 (6th ed. 1902)). In fact, Bell has cited no authority from other jurisdictions that advocates the contrary rule; he relies mainly on the Silver Blue Lake dicta and the opinion below.
Although this distinction is clearly marked in the decisional law and commentaries, the rationale for the dichotomy has not been clearly articulated. We believe, however, that sound policy reasons do exist which caution against the broad rule adopted by the district court in this case.
The first reason for this dichotomy pertains to a lake developer's expectations in his investment. Because the construction of a man-made water body often involves the expenditure of substantial sums of money and the expense is not, as a rule, divided proportionately among the various abutting owners, the individual making the expenditure is justified in expecting that superior privileges will inure to him in return for his investment. In contrast, the abutting owners to a natural water body probably invest proportionally equal amounts for the increased value of the water front property. While there are certainly exceptions to this general scenario, we believe that the district court's rule will more often result in an injustice, than in a correct decision.
The case sub judice presents the precise facts that demonstrate the injustice which would result from the approach taken by the lower court. Here Anderson expended substantial sums of money to improve his land; he also compensated the adjacent estate for damages and should be entitled to exercise exclusive dominion over the improvement.
The United States Supreme Court has recognized a distinction between public access to navigable waters and access to connected man-made alterations where substantial sums of money were expended to create the alteration. Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In that case the appellants had spent considerable sums of money to transform a "fishpond" into a marina. Through the efforts and expense of the appellants the "fishpond," which was previously separated from the navigable interstate waterway by a natural barrier, was dredged and connected to the bay via an eight-foot channel. As a result, the area became accessible to boats travelling the interstate waterways. The appellants attempted to capitalize on their investment by forming a private marina for which fees were levied and the general right of public access was denied. The government brought suit contending that the public could not be denied access to the marina by virtue of the navigable character of the transformed waterway. The Court held that before the government can take over management of the property or even "physically invade an easement in the property", it must condemn the property and pay just compensation. Id. at 179-80, 100 S.Ct. at 393. The Court considered as an important factor in determining the "taking" issue, the governmental interference with the appellants' reasonable investment backed expectations. Id. at 175, 100 S.Ct. at 390 (emphasis supplied).
Although we do not intimate that a contrary rule in the instant case would constitute a due process taking, we are inclined, nevertheless, to consider this factor before establishing a rule that will allow other persons to make use of the Andersons' land. See also Silver Blue Lake, 245 So.2d at 617-18 (Ervin, C.J., dissenting).
We note, further, that our holding today does not deprive the public of any right that they had previously possessed; therefore, our concern in Duval over the availability of lakes for tourism is not frustrated by this decision. Cf. Duval, 144 So.2d at 795; see Maloney, Water Law 61. Further, we believe a contrary rule may serve to dissuade Florida homeowners and investors from making improvements that not only increase property values but also aesthetically improve adjacent lands, since they would run the risk of losing some of their *1206 property rights to other people merely because the water body touches another's property. In the event that the water happens to take a course that would result in the flowage over public lands, the entire water body would become accessible to numerous piscators, bathers and boaters, thereby destroying the property owners' investment benefits. Under the district court decision, this would occur irrespective of whether or not reasonable compensation was paid by the developer to acquire the flowage easement.
Our apprehension in adopting the district court rule today is further based on our concern over the ramifications of such a broad rule and its effects in factual scenarios different from the case sub judice. Adherence to the district court's bright-line rule, in many situations, may lead to unjust results. One such consideration, as tailored to the facts in this case, would be the various riparian owners' rights to enjoin Anderson from reclaiming his land. If Bell has truly acquired "riparian rights" in the water, it seems apparent that these "rights" would include the right to enjoin Anderson from draining the lake. See Taylor v. Tampa Coal Co., 46 So.2d 392, 394 (Fla. 1950).
Another concern of ours involves the difficulty in limiting such a broad rule: Does an adjoining landowner to a drainage ditch have the right to follow the water surface and use all adjacent waters? Of equal concern would be the application of this rule to artificial alterations to water-courses. See generally Evans, Riparian Rights In Artificial Lakes And Streams, 16 Mo.L.Rev. 93 (1951). Although we need not answer the aforementioned questions, we remain cognizant of these hypotheticals in an effort to fashion a rule of law that will not result in untold horrors. Although we choose not to extend the Duval rule to man-made water bodies, this is not to say that rights to the beneficial use in these bodies cannot be acquired by other means. We believe that legal doctrines already in existence provide the flexibility necessary to achieve just results in a variety of factual contexts. See Farnham, Water Rights 2407.
In the first place, the respective parties are in a position to bargain for the rights obtained in the water body. These rights may be determined by express contract, such as covenants or easements. Silver Blue Lake, 245 So.2d at 612. There was nothing to prevent Bell's predecessor in title from bargaining for an easement to use the water in exchange for the flowage right they granted to Anderson. However, the former owners chose to take monetary compensation for the "loss" of their property. When Bell took possession he did so with full knowledge that a flowage easement existed on the land, and with no reason to believe that the easement contract entitled him to a dominant tenancy with respect to the Andersons' property. In fact, the easement specifically states that Anderson has the exclusive right to discontinue the flowage if he so desires.
Further, we are concerned that a contrary rule would place the owners of adjacent land in an unequal bargaining position with respect to flowage rights sought by the person constructing the lake. Adjacent landowners would be in a position to set exorbitant prices for the flowage rights on their land knowing that they would receive full beneficial use of the lake irrespective of the price. This, we believe, may also frustrate the development of these waters, which is capital improvement we should not discourage.
We are aware that the ideal situation, where parties are able and willing to bargain for the respective rights in water bodies, does not always exist. There are, however, numerous legal doctrines that can be imposed to ascertain these rights without injustice. For example, in Walden v. Pines Lake Land Co., 126 N.J. Eq. 249, 8 A.2d 581 (N.J. 1939), the plaintiff had conveyed a flowage easement to the defendant who was constructing a dam to form a lake. The plaintiff also gave to defendant a pro-rata share of the cost of the dam. The court estopped the defendant from denying plaintiff from beneficially using the lake.
In another case, land adjoining an artificial lake was held in common ownership and *1207 was divided and sold to various purchasers, an implied easement was held to have been granted to the purchasers to use the lake and to prevent the defendant from draining the lake. Greisinger v. Klinhardt, 321 Mo. 186, 9 S.W.2d 978 (Mo. 1928). See also Cartish v. Soper, 157 So.2d 150 (Fla. 2d DCA 1963) (riparian rights implied in easement granting access to water).
In a leading law review article, Dean Evans discusses various doctrines that have been used by the courts to determine the rights of parties in a man-made (artificial) lake, where the parties failed to secure express covenants or easements. Evans, at 93. Dean Evans states the fairly typical hypothetical model as follows:
An owner of land bordering on a stream or lake finds it to his advantage to erect a dam and flood the lands above. For present purposes let it be assumed that he meets with no resistance and in time acquires by adverse user the right to the flowage over the lands in question. One important consequence often is that the upper owners of the lands so overflowed make use of the raised level of the water and build summer cottages, around the lake so formed, or use it for the creation of summer pleasure resorts, boating and other things. Based on what theory may they claim a continuance of this situation?
Id. (Footnote omitted). These other jurisdictions have taken various approaches to this problem to reach a reasonable result. In cases where the lake has been in existence for many years, some courts find that it has become de facto natural and, therefore, riparian rights obtain. Id. at 92-117; Maloney, Water Law 63-64. Other jurisdictions have found prescriptive and "reciprocal prescriptive easements" to exist. Evans, at 96.
We note this hypothetical and the dispositions taken by other jurisdictions without expressing or intimating any intent to adopt doctrines not already in use in Florida, but merely for discussion purposes. Such an occasion for adoption of these views is only proper when a case is squarely presented to the court and appropriate argument has been made.
In any event, the aforementioned doctrines would be to no avail to Bell in the case sub judice, even had he argued that they were applicable. Had Bell's predecessor merely acquiesced in the flowage for a significant period of time, or had he conveyed the flowage easement for nominal consideration, a different case would be presented in which one of the aforementioned principles may be properly applied. However, we leave the answer to this question for another day.
We hold today that an owner of lands that lie contiguous to or beneath a portion of a man-made lake has no right to the beneficial use of the entire lake merely by virtue of the fact of ownership of the land. Accordingly, we quash the decision of the district court of appeal and remand the cause to it with instructions to reverse the judgment of the trial court and remand with directions to issue the injunction requested by the plaintiff.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and EHRLICH, JJ., concur.

*1208 APPENDIX