## TAYLOR, et al. v NORTHWEST FLORIDA WATER MANAGEMENT DISTRICT and THE STATE OF FLORIDA

### Case No. 87-1164-CAB

Second Judicial Circuit, Gadsden County

December 12, 1988

## OPINION OF THE COURT

P. KEVIN DAVEY, Circuit Judge.

### *SUMMARY JUDGMENT*

Leland taylor and thirty-three other property owners[1] similarly situated (Plaintiffs) seek damages from the Northwest Florida Water Management District and the State of Florida (Defendants) for the removal of the Dead Lakes Dam in Gulf County, Florida. The Plaintiffs' theory of recovery is based upon the doctrine of inverse condemnation. The parties have entered into a stipulation concerning

---

[1] Twenty-nine of the Plaintiffs own residential properties on the Chipola River ("Dead Lakes area"); three, (Paris Carter, Wayne Love and James Stokes) also claim damages for loss of income from their respective businesses near the "Dead Lakes;" and one (Jerry Jones) owns a non-waterfront property but claims damages for loss of value to his property.

all the relevant and material facts surrounding the dispute and have agreed that the resolution of the case requires only a determination of the applicable law. Both sides concur that the case is ripe for a summary judgment.

## FACTS

The "Dead Lakes" are a wide place in the Chipola River covering approximately ten (10) miles within Gulf and Calhoun Counties. Prior to the installation of the Dead Lakes Dam, the area known as the "Dead Lakes" would fluctuate throughout the year and from year-to-year, based upon the level of the water flows in the Chipola River as well as the height of the Chipola Cutoff, (the fork of the Apalachicola River) into which, just below the Dead Lakes, the Chipola River drains. When the Apalachicola River and, therefore, the Chipola Cutoff were high, a back water or damming effect tended to keep the level of the Dead Lakes up. The fluctuations in the lake would range from a low flow in which the water would be limited to the river channel of the Chipola River to a high flow wherein the Dead Lakes would be maintained at its ordinary high water mark for approximately three months out of the year.

During the period of 1954 through 1958, the Dead Lakes suffered from extremely low flows wherein the water level was reduced to about ten (10) feet NGVD. This low water was caused by a combination of severe drought and the construction of the Jim Woodruff Dam at the confluence of the Flint and Chattachoochee Rivers which impounded the flow of water into the Apalachicola River.

The Florida Legislature created the Dead Lakes Water Management District through the passage of Chapter 57-1115, *Laws of Florida.* The Dead Lakes Water Management District was authorized to manage, control, and engage in the conservation, development, utilization, and disposal of water in that area described as the Dead Lakes and the Chipola River, which is more particularly described in Section 3 of Chapter 57-1115. In order to carry out the purposes of the Act, the Dead Lakes Water Management District was authorized to maintain and operate any projects or facilities which might be constructed or created in order to carry out the provisions of the Act.

In approximately 1958, the Dead Lakes Water Management District, in conjunction with the U.S. Army Corp of Engineers, constructed a stop log, low head, sheet pile weir just below and parallel to the bridge on which State Road 22-A crosses the water flowing out of the Dead Lakes. The 787-foot weir was completed in late 1959 or early 1960 alongside the State Road 22-A bridge.

The dam was designed to maintain the Dead Lakes at elevations up to 18.2 feet NGVD, in times of low flow. The stop log feature in the middle of the dam allowed adjustments so that elevations of less than 18.2 feet could also be maintained. This water level approximates, but is somewhat lower than, the high water line.[2]

In 1974, the Dead Lakes Water Management District, in conjunction with other state agencies, installed four culverts about seven feet high and twelve feet wide to the west of the dam in order to provide better drawdown capability and as a means of controlling aquatic weeds in the lake. The drawdown structure was equipped with gates that could be raised and lowered to effectuate drawdowns on the lake. The drawdown structure would permit the Dead Lakes to be drawn down to about fourteen (14) feet NGVD.

For about three months of the year, neither the dam nor the drawdown structure would determine how high the water in the Dead Lakes would be because the interaction between the flows in the Chipola River and the Chipola Cutoff would keep the Dead Lakes at, or above, the weir crest level (18.2 ft, NGVD). During this part of the year, usually between December and March, the absence or presence of the dam would make no difference in the lake level.

The Chipola River is a navigable waterway as defined by federal standards. Further, the Dead Lakes had been meandered prior to Florida's admission as a State.

At the time of the construction of the Dead Lakes Dam, there were no official declarations from the State of Florida, the Dead Lakes Water Management District, or the U.S. Army Corps of Engineers, that the Dead Lakes Dam would or would not be perpetually maintained. There were no official representations from the State of Florida in the Dead Lakes Water Management District enabling legislation (Chapter 57-1115, *Laws of Florida),* nor any other legislation, that any structure to be constructed on the Dead Lakes would or would not be permanent in nature. No maintenance work had been performed on the dam itself since 1962. The dam had a remaining useful life of about ten (10) years at the time it was removed.

In 1984, the Florida Legislature passed Chapter 84-380, *Laws of Florida,* transferring control of the Dead Lakes Dam from the Dead Lakes Water Management District to the Northwest Florida Water Management District solely for the purpose of removing the dam. The

---

[2] The Defendants did not stipulate as to the exact location or height of the ordinary high water line.

application by the Northwest Florida Water Management District to obtain a permit from the Florida Department of Environmental Regulation for the removal of the Dead Lakes Dam was challenged under Chapter 120, Florida Statutes, in the administrative proceedings titled *Daniel M. Sullivan, et al. v Northwest Florida Water Management District, et al.,* DOAH Case Number 84-4468 and *Raymond Drainville v Northwest Florida Water Management District, et al.,* DOAH Case Number 85-0129.[3] Those proceedings resulted in the issuance of a final and recommended order which granted Northwest Florida Water Management District a permit to remove the Dead Lakes Dam. The final and recommended orders are published at 9 FALR 5391 (Final Order, DER, September 22, 1987).

In December, 1987, the Dead Lakes Dam was removed by the Northwest Florida Water Management District after having received all applicable permits therefor. The legal authority of the State of Florida, through the Northwest Florida Water Management District, to remove the dam is not in question in this case; and their authority both legally and procedurally has been established.

There are three categories of Plaintiffs in the instant case:

a. Those who claim to own individual lots or property directly abutting the ordinary high water line of the Dead Lakes (32 Plaintiffs);

b. Those who own businesses in existence for more than five years abutting the ordinary high water line of the Dead Lakes (Carter, Love and Stokes); and

c. One Plaintiff (Jones) who owns a non-waterfront lot which was purchased for its proximity to the Dead Lakes ordinary high water line and has or will allege arrangements for use of a boat ramp located at the ordinary high water line.

The parties stipulated that one or more of those Plaintiffs in categories 16(a) and 16(b) above owned property during the time period of the existence of the dam which property line extends to and coincides with the ordinary high water line of the Dead Lakes.

Subsequent to the removal of the dam, the property of one or more of the Plaintiffs in categories 16(a) and 16(b) above will be adjacent to or abutting the actual water's edge of the Dead Lakes for approximately three months per year; the remaining nine months per year their property will not be adjacent to or abutting the water's edge; that

---

[3] A number of the Plaintiffs in this cause took part or had their interests represented in these administrative proceedings.

44

is, during those nine months the water's edge could be as much as several hundred yards from a particular Plaintiff's property line. One or more of those Plaintiffs in categories 16(a) and 16(b) above have built improvements on their property consisting of boat docks and/or boat ramps, which, as a result of the removal of the dam, will be rendered wholly or partially unusable approximately nine months per year.

In the geographic area of the Dead Lakes, waterfront property generally has a higher real estate value than non-waterfront property. The property values as determined by the property appraisers of the respective counties in which the subject properties lie are generally higher for waterfront property than for non-waterfront property, and this results in higher tax assessments for the waterfront properties. The removal of the Dead Lakes Dam has allegedly resulted in lower property values for some of the affected Plaintiffs.

At and before the time it was installed, the dam was reported in local newspapers as providing " . . . some of the finest fishing havens in the world." (Dothan Eagle, March 27, 1959). It would " . . . boost the economy of this entire section . . ." (Jacksonville Times Union, August 17, 958); and that "He [Congressman Robert Sikes] predicted that this area has the greatest potentialities for both industrial development and becoming the sports capital of the Southeast . . . the placing of a dam in the lake should be merely the starting point in the development of the sportmens' paradise hereabouts." (Jacksonville Times Union, September 23, 1954).

After the installation of the dam, property was allegedly advertised by local realtors as waterfront property and was allegedly sold to various individuals as waterfront property.

The Department of the Army Corps of Engineers, in a memorandum dated March 21, 1986, noted that probably the greatest impact by the proposal (to remove the dam) is that it will cause an access problem for fish camp users and land owners. The memorandum further noted that access during low water levels would be cut off to most upland owners where high water access had been established. The memorandum concluded that the removal of the dam would have a negative impact on all waterfront property but that the esthetics, the environment, fish and wildlife values, navigation, recreation, and water quality would benefit from the removal. The Corps of Engineers found that the removal of the dam would not be contrary to public interest. Additionally, the Northwest Florida Water Management District, by memorandum dated January 10, 1983, acknowledged that the removal of the

**45**

dam would perhaps cause access problems for some fish camp users and landowners.

## CONCLUSIONS OF LAW

Essentially, Plaintiffs assert that the "Dead Lakes" portion of the Chipola River is a natural or permanent water body to which they have acquired riparian rights; that these riparian rights should be considered separate and apart from other rights extant in their property ownership; and that riparian rights cannot be taken by governmental action without just compensation. In the alternative, they argue that the Court should apply the doctrines of equitable estoppel and/or prescription to support their claim for compensation for the alleged taking.

The Defendants assert numerous grounds to counter Plaintiffs' claims but essentially argue that the Defendants' riparian rights attach only to the ordinary high water mark and that the Plaintiffs have acquired no riparian rights in the artificially maintained high water mark (actually a artificially maintained low water mark) which was caused by the construction of the weir or dam in approximately 1959. The Defendants further argue that the doctrines of equitable estoppel and prescription are not available against a State or one of its agencies in the absence of a fraudulent misrepresentation by the State, its employees, or agents.

It is undisputed that riparian rights are property rights which cannot be taken without just compensation. *Belvedere Development Corp. v Department of Transportation,* 476 So.2d 649 (Fla. 1985). Riparian rights have been defined by the legislature as those:

" . . . incident to land bordering upon navigable waters. . . . Such rights are not of a proprietary nature. They are rights inuring to the owner of the riparian land but not owned by him. They are appurtenant to and *are inseparable from the riparian land.* The land to which the owner holds title must extend to the ordinary high watermark of the navigable water in order that riparian rights may attach." *E.S. Florida Statute* Section 253.141(1).

Riparian rights of access attach to property owners "who owned land extending to (the) ordinary high-water mark of navigable waters." *Brickell v Trammell,* 82 So.2d 221 (Fla. 1919). While the parties have not stipulated to the precise location of the ordinary high water line of the Chipola River in the "Dead Lakes" region, they have stipulated that the ordinary high water mark is some measure *higher* than the 18.2 water line elevation that was maintained by virtue of the Dead Lakes Dam.

46

The ordinary high water mark of the Chipola River was not in any ways altered by either the construction of the dam or its subsequent removal. This critical mark was and is established by the natural flow of the Chipola River. The fact that the river actually ebbs below this mark for approximately nine months of the year likewise is of no significance to the establishment of the ordinary high water mark. Additionally, neither the construction of the dam nor the State's maintenance of the water level of the Dead Lakes at approximately 18.2 feet NGVD altered the Plaintiffs' ownership rights or appurtenant riparian rights. They owned to the ordinary high water line of the Chipola River — not more and not less.

Florida courts have not squarely addressed the issue of whether or not riparian rights attach to artificially maintained levels of a *navigable* water body. In *Anderson v Bell,* 433 So.2d 1202 (Fla. 1983) the Florida Supreme Court held that riparian rights do not attach to the land bordering on an artificial body of water (in that instance a man-made lake which was non-navigable). In this narrowly drawn opinion, the Supreme Court declined to enunciate a general or bright line rule which might also be applicable to navigable waters. However, an implication which may be clearly drawn from this case is that if riparian rights could be acquired in an artificially maintained level of a navigable water body, the riparian owner would be entitled to the additional right to enjoin the owner from altering the water level. *Anderson* at 1206. The clear implication is that the Supreme Court would disdain the option of permitting the Plaintiffs in the instant case from enjoining the State from altering the water level in some manner; or in lieu thereof allowing compensation for the *lowering* of the water level.

Further, other jurisdictions which have considered this question have generally held that when a level of water is artificially created or maintained by a governmental or state agency, riparian landowners do not acquire additional riparian rights as to the artificial level of the water body in question. (See for example *United States v 1,629 Acres of Land,* 503 Fed. 2d 764 (3rd CCA 1974); and *Moorman v Department of Conservation,* 160 N.W.2d 909 (Michigan 1968).

With respect to the Plaintiffs' alternate theories of recovery, the Plaintiffs may not utilize the equitable theories of estoppel or prescription in this case. It was stipulated that neither the State of Florida nor any of its sub-agencies or their employees made any representations, either fraudulently or in error, concerning the permanency *vel non* of the Dead Lakes Dam. Any representations, statements or puffing by

**47**

real estate brokers, agents or congressman may not be ascribed or imputed to the Defendants herein. [See *Anderson,* supra; *Bryant v Peppe,* 238 So.2d 836 (Fla. 1970); and *Seaside Properties, Inc v State Road Department,* 190 So.2d 391 (3d DCA 1966).] Further, the dam itself, including the observable mechanisms to decrease the flowage of water through it, placed the Plaintiffs and all those similarly situated on notice that the flowage or level of water may not be permanent in character.

Finally, the Plaintiffs have not been able to demonstrate that the State has substantially deprived them of all beneficial use of their property. Such a showing is required to sustain an action for damages in inverse condemnation. [See *Graham v Estuary Properties, Inc.,* 399 So.2d 1374 (Fla. 1981) and *Village of Tequesta v Jupiter Inlet Corp.,* 371 So.2d 663 (Fla. 1979).] Plaintiffs argue that riparian rights should be separate and distinct from other property rights in their land and that all beneficial use of their *riparian rights* have been substantially taken. However, the fact that the Chipola River will for approximately three months give them direct access to its waters demonstrates that their beneficial use has only been impaired and not taken.

Additionally, this Court rejects the premise that riparian rights are separate and distinct from other rights of ownership and possession. In its definition of riparian rights, the Florida Legislature has stated that such rights "are appurtenant to and are *inseparable* from the riparian land." *Florida Statute* Section 253.141(1). The legislature appears to have definitively spoken in this regard and this Court is duty bound to follow that pronouncement. Accordingly, it is

ORDERED AND ADJUDGED that the Defendants' Motion for Summary Judgment is granted. There are no material facts in dispute, and as a matter of law the Plaintiffs' claim for damages under inverse condemnation should be dismissed with prejudice. Each party shall bear their respective costs and attorneys fees.

DONE AND ORDERED in Chambers at Quincy, Gadsden County, Florida, this 12th day of December, 1988.