186 So.2d 302 (1966)
Gerald B. HAGAN et al., Appellants,
v.
SABAL PALMS, INC., a Florida Corporation, Appellee.
No. 5818.
District Court of Appeal of Florida. Second District.
March 23, 1966.
Rehearing Denied June 3, 1966.
*304 Kirk, Pinkerton, Sparrow, Trawick & McClelland, Sarasota, for appellants.
Worth Dexter, Jr., of Dexter, Conlee & Bissell, Sarasota, for appellee.
PIERCE, Judge
This case involves restrictive deed covenants against erection of any building except a dwelling in an unplatted subdivision and the binding effect thereof upon a successor grantee in one of the parcels, who was allegedly without personal notice of such restrictions.
The common grantor, one Koen, owned certain described property in Sarasota County which he divided off into two blocks, Block 1 and Block 2. Block 1 contained eight numbered lots and Block 2 contained seven numbered lots. The two blocks were parallel to each other with a thirty foot entrance driveway running between the two blocks from the main access street or road known as "Stickney Point Road." The two blocks were in the form of a finger, being bounded largely on the westerly, southerly, and easterly side by canals and on the northerly side by Stickney Point Road. The thirty foot center *305 access driveway did not go all the way through between the two blocks but abutted at its southern extremity into a separate lot marked "A", making the same a deadend driveway, obviously to service the lots on either side in the two blocks.
The property, as so divided into blocks and lots, was given the name of "Sabal Palms Subdivision" by the original owner, Koen, who did not record the plat among the Public Records. However, a sketch of the subdivided property is as follows:

*306 The lots were sold off by Koen to various purchasers, and in each of the conveyances from Koen[1] the following restrictive covenant was contained:
"No building shall be used for any purpose other than as a dwelling."
In due course lots 1 and 2 of Block 2 came under ownership of Sabal Palms, Inc., a Florida corporation, which announced plans to construct a restaurant building on its two lots in defiance of the restrictive covenants aforesaid. The owners of the other residential lots in the subdivision promptly notified Sabal Palms, Inc., prior to commencement of such construction, that they would enforce said commercial building restriction, but nevertheless Sabal proceeded to build the restaurant building.
The other home property owners thereupon joined together as plaintiffs in the filing of an amended complaint in the Circuit Court for Sarasota County against Sabal Palms, Inc., alleging generally the foregoing and also attaching thereto the sketch of the subdivision hereinbefore set forth.[2] The amended complaint alleged that the quoted restriction appeared in the chain of title of each of the property owners of the subdivision, including Sabal Palms, Inc., by virtue of the original deeds from the common grantor, and that therefore Sabal had at least constructive notice of said restriction. It was also alleged that the subdivision was a compact piece of property, had been developed uniformly and as a single unit, that the restrictive covenants had been placed in the original conveyances by the common grantor in pursuance of a general scheme for the purpose of preserving the character of the property as residential property, and that the plaintiffs and their predecessors in title had purchased their respective parcels in consideration of the restrictions imposed against commercial building. The amended complaint thereupon alleged that plaintiffs were without adequate remedy at law and asked the Court to declare said restrictions "in full force and effect as to defendant and its said property" and to issue such injunctive relief as would protect the rights of plaintiffs.
Defendant Sabal filed motions to dismiss the amended complaint upon various grounds, and the Court upon hearing entered "Order of Dismissal," reciting and holding inter alia as follows:
"2. On the Motion to Dismiss, * * the Court finds that the Amended Complaint does not sufficiently allege that the Defendant had notice, at the time it purchased the subject property, that said property was restricted for the benefit of the Plaintiffs, whether by virtue of notice of any general and uniform plan of restriction, or otherwise. * * *
"* * * The Court offered the Plaintiffs the right to amend further to allege notice to the defendant of the existence of a general restrictive plan, as referred to above in paragraph `2' of this Order, but the Plaintiffs declined to amend further and advised the court that they were ready for the entry of an Order of Dismissal. The Amended Complaint and the above styled suit are therefore hereby dismissed without leave to amend."
Plaintiffs have appealed and assign as error the entry of the Order of Dismissal aforesaid. We feel impelled to hold the able Chancellor in error and to reverse his said Final Order, for two reasons:
(1) The amended complaint, on its face and undenied, pleads, sufficient to withstand assault by motion to dismiss, facts that show 

*307 (a) a general building scheme and plan of development and improvement of the subdivision for an exclusive residential area,
(b) that said restrictive covenants were such as run with the land, and
(c) that defendant had adequate legal notice that the restrictions were for the benefit of plaintiffs; and
(2) Under all the facts alleged, the cause should not be summarily terminated at the pleading stage, but should be accorded a full trial of all the factual considerations involved, before final disposition.
Where the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee, either on the theory that there is a mutuality of covenant and consideration, or on the ground that mutual negative equitable easements are created; and this doctrine is not dependent on whether the covenant is to be construed as running with the land. 26 C.J.S. Deeds § 167(2), p. 1143 et seq. Building restrictions imposed by a grantor on lots, being evidently for the benefit, not only of the grantor, but also of his grantees and subsequent successors in title, the burden, as well as the benefit, of the restrictions is an incident to ownership of the lots, because in a neighborhood scheme the burden follows the benefit. Kittinger v. Rossman, 12 Del. Ch. 228, 110 A. 677; Palmer v. Circle Amusement Co., 130 N.J. Eq. 356, 22 A.2d 241; Reed v. Williamson, 164 Neb. 99, 82 N.W.2d 18; Edwards v. Surratt, 228 S.C. 512, 90 S.E.2d 906.
A "general building scheme" may be defined as one under which a tract of land is divided into building lots, to be sold to purchasers by deeds containing uniform restrictions. Whether restrictions in deeds are part of a general scheme is to be determined by the intention of the parties, as gathered from the words used, interpreted in the light of all the circumstances and the pertinent facts known to the parties. Ordinarily the right to enforce restrictions imposed pursuant to a general scheme must be universal or reciprocal, that is, the same restrictions must apply substantially to all lots of like character or similarly situated. A minor or isolated exception or exceptions, however, will not impair or insulate the efficacy of the general scheme.[3] 26 C.J.S. Deeds § 167(2)b, p. 1147 et seq. See Edgewater Beach Hotel Corporation v. Bishop, 1935, 120 Fla. 623, 163 So. 214; Osius v. Barton, 1933, 109 Fla. 556, 147 So. 862, 88 A.L.R. 394. Here the words used in the deeds from the common grantor, viz.: "No building shall be used for any purpose other than as a dwelling," were clear, concise and to the point, and could not have failed to have expressed the intention of the parties that is, the original grantor and his immediate grantees, to establish a general scheme of exclusive residential building.
And restrictions imposed by a general plan, according to the more generally accepted rule laid down in the law books, are valid and may be enforced even though not specifically incorporated in the deed to the person against whom enforcement presently is sought or in all the conveyances to the various grantees.[4] 26 C.J.S. Deeds § 167(2)a, p. 1146, and cases there cited. Also, it is not essential to the existence of a uniform plan that there should be plats or dedication maps filed, or that there should even be uniform plottage; and, where it is the general intent of the grantor to impose restrictions for the benefit of lot owners generally, the fact that a general plan is not filed is not conclusive. 26 C.J.S. Deeds § 167(2), p. 1151; Scholtes v. McColgan, 184 Md. 480, 41 A.2d 479; *308 Storey v. Brush, 256 Mass. 101, 152 N.E. 225.[5]
In Osius v. Barton, 1933, 109 Fla. 556, 147 So. 862, 88 A.L.R. 394, a real estate developer, in pursuance of a general plan of developing and subdividing certain described real estate for exclusive residential purposes, inserted in its common grantor deeds a restrictive covenant aimed at permitting only residential construction, and thereafter certain grantees, who had acquired property in the restricted area by mesne conveyances, sought to operate a beauty parlor thereon. Plaintiffs Barton and others, as owners of property in the development from the common grantor, brought suit to restrain the violation by the Osiuses. Both the lower Court and the Supreme Court upheld the enforceability of the restrictive covenant and enjoined the violation. In the course of the opinion the Supreme Court stated as follows (text 147 So. 865):
"The general theory behind the right to enforce restrictive covenants is that the covenants must have been made with or for the benefit of the one seeking to enforce them. The violation of a restrictive covenant creating a negative easement may be restrained at the suit of one for whose benefit the restriction was established, irrespective of whether there is privity of estate or of contract between the parties, or whether an action at law is maintainable. The action of a court of equity in such cases is not limited by rules of legal liability and does not depend upon legal privity of estate, or require that the parties invoking the aid of the court should come in under the covenant, if they are otherwise interested. The rule is well established that where a covenant in a deed provides against certain uses of the property conveyed which may be noxious or offensive to the neighborhood, inhabitants, those suffering from a breach of such covenant, though not parties to the deed, may be afforded relief in equity upon a showing that the covenant was for their benefit as owners of neighboring properties. (Cases cited) * * *.
"[T]he right in equity of grantees from a common grantor to enforce, inter sese, covenants entered into by each with the grantor, or running with the land as emanating from the common grantor, is ordinarily confined to cases where the scheme of restriction contemplated by the deeds is universal or reciprocal, as the consideration for the obligation to observe the restrictions is the imposition of the same or kindred restrictions on other lots similarly situated."
And further, in Osius, is the following (text 147 So. 866):
"A uniform plan of development is not a sine qua non for sustaining the validity of building restrictions per se. But the presence or absence of such a uniform plan may be the main factor in many cases by which the beneficial interest of a complainant asking for the judicial enforcement of such restrictive covenants is to be determined when it is not otherwise apparent. Proof of a general plan or scheme for the improvement of the property, as a prerequisite to the right of grantees from a common grantor to enforce, inter sese, covenants entered into by each with, or through, the grantor, is only required to show that the covenant sought to be enforced has entered into the consideration for the grant of the title, and therefore such as should be exacted from each purchaser for the benefit of all purchasers."
It is undoubtedly the law of Florida that covenants restraining the free use of realty are not favored, but in order to provide the fullest liberty of contract and the widest latitude possible in disposition of one's property, restrictive covenants are enforced so long as they are not contrary to public policy, do not contravene any *309 statutory or constitutional provisions, and so long as the intention is clear and the restraint is within reasonable bounds. Sinclair Refining Co. v. Watson, Fla. 1953, 65 So.2d 732; Ballinger v. Smith, Fla. 1951, 54 So.2d 433; Moore v. Stevens, 1925, 90 Fla. 879, 106 So. 901, 43 A.L.R. 1127.
Moore v. Stevens is strongly analogous to the case at bar in factual respects. There the common grantor, in inaugurating a residential subdivision, included in the conveyances to his original grantees a provision that "the property hereby conveyed is to be used for residence purposes only." A successor owner of one of the lots sought to use a building erected by him upon said premises for purpose of conducting a vocal studio, giving singing and music lessons for hire. Another residence owner in the subdivision brought suit to restrain the use of said building for such commercial purposes, notwithstanding the building was also being used as the residence of and for the music teacher and in fact had originally been largely, but not entirely, built for such purpose. The Circuit Court, however, held such restrictive covenant valid and binding and enjoined the use of said premises for the stated commercial purposes. It will be observed that the quoted covenant there involved was identical in meaning and intendment to the covenant in the instant case. The Supreme Court, in affirming the lower Court in Moore, expounded the law governing such restrictive covenants in Florida as follows, and we quote at length because of the persuasive language as applied to the instant case:
"The only substantive question presented for determination is whether or not the use by appellant of his premises in the manner described is a violation of the restrictive covenants hereinabove quoted
"The covenants here under consideration relate to the use to be made of the property rather than to the character of the building to be erected upon it.
* * * * * *
"Covenants restraining the free use of real property, although not favored, will nevertheless be enforced by courts of equity where the intention of the parties is clear in their creation, and the restrictions and limitations are confined to a lawful purpose and within reasonable bounds, unless the rights created by such covenants have been relinquished or otherwise lost. Such covenants are strictly construed in favor of the free and unrestricted use of real property, but effect will be given to the manifest intention of the parties as shown by the language of the entire instrument in which the covenant appears, when considered in connection with the circumstances surrounding the transaction. Due regard must be had for the purpose contemplated by the parties to the covenant, and words used must be given their ordinary, obvious meaning as commonly understood at the time the instrument containing the covenants was executed, * * *.
* * * * * *
"The expressed intent of the parties is the controlling factor. Intent unexpressed will be unavailing, and substantial ambiguity or doubt must be resolved against the person claiming the right to enforce the covenant. Easterbrook v. Hebrew Ladies' Orphan Society, 85 Conn. 289, 82 A. 561, 41 L.R.A., N.S., 615; 18 C.J. 388.
"The covenant under which appellee claims the right to injunctive relief is the one which provides that appellant's property `is to be used for residence purposes only.' There is no ambiguity in the quoted expression, nor doubt as to its meaning, when considered in the light of the entire transaction in which it was used and its component words are accorded their ordinary, well-understood meaning. The word `residence' is one of multiple meanings, but the context in which it is used in this instance clearly indicates its meaning to be a dwelling *310 house where a person lives in settled abode." (Emphasis supplied)
The foregoing has largely to do with the doctrine of the "general scheme of development." An analysis of the amended complaint before the Court impels the conclusion that the covenant here involved also "runs with the land." The rule is stated in 26 C.J.S. Deeds § 167(1), p. 1138, as follows:
"Subject to statutory limitations,[6] as a general rule, restrictive covenants affecting the estate conveyed and the mode of its enjoyment are regarded as running with the land, and the liability for the performance of such covenants, or the right to enforce them, passes with the title to the land itself. * * * [A] restrictive covenant running with the land does so without any declaration to that effect, * * *."
And also on page 1142 of the same work:
"Restrictions limiting the use of land, if reasonable, may be enforced in courts of equity against the land designated to be benefited or burdened in whosesoever hands it may be, without regard to whether the creation of the restriction is in the nature of an easement or of a covenant, provided the parties, both grantee and grantor, understood the nature and burden of the restriction and had notice thereof, either actual or constructive. Whether a restrictive covenant runs with the land is material in equity only on the question of notice; since, if it runs with the land, the covenant binds the owner regardless of knowledge, and if not, he is bound only if he took the land with notice." (Emphasis supplied).
An analogous case in Florida on the "running with the land" doctrine is Maule Industries, Inc. v. Sheffield Steel Products, Inc., Fla.App. 1958, 105 So.2d 798. In Maule, the Court said (text 105 So.2d 801):
"A covenant running with the land differs from a merely personal covenant in that the former concerns the property conveyed and the occupation and enjoyment thereof, whereas the latter covenant is collateral or is not immediately concerned with the property granted. If the performance of the covenant must touch and involve the land or some right or easement annexed and appurtenant thereto, and tends necessarily to enhance the value of the property or renders it more convenient and beneficial to the owner, it is a covenant running with the land. The covenant in question comes within the above stated rules and constitutes a covenant running with the land.[7] See Thompson on Real Property, Perm.Ed., § 3622, p. 111; 3 Tiffany on Real Property, 3d Ed., § 854, pp. 455-462; and 14 Am.Jur., Covenants, Conditions and Restrictions, §§ 19, 20, pp. 495-498. As discussed in the last mentioned authority (§ 20, pp. 496-497):
"`The primary test whether the covenant runs with the land or is merely personal is whether it concerns the thing granted and the occupation or enjoyment thereof or is a collateral or a personal covenant not immediately concerning the thing granted. In order that a covenant may run with the land it must have relation to the land or the interest or estate conveyed, and the thing required to be done must be something which touches such land, interest, or estate and the occupation, use, or enjoyment thereof.
* * * * * *
"`* * * the question whether a covenant runs with the land does not depend upon its being performed upon the land itself; its performance must *311 touch and concern the land or some right or easement annexed or appurtenant thereto and tend necessarily to enhance its value or render it more convenient and beneficial to the owner or occupant. * * *'"
As said in the earlier case of Burdine v. Sewell, 1926, 92 Fla. 375, 109 So. 648, "A covenant is said to run with the land when either the liability to perform it or the right to take advantage of it passes to the vendee or other assignee of the land." We think the instant covenant comes well within this quoted text. Sabal had the liability or obligation to perform it and the other property owners in the subdivision had the right to take advantage of it. The converse would be equally true. This would categorize the covenant as one running with the land.
This brings us to the question of notice, the point upon which the Chancellor hinged his final order. The Chancellor found that the amended complaint did not "sufficiently allege that the Defendant had notice, at the time it purchased the subject property, that said property was restricted for the benefit of the plaintiffs, whether by virtue of notice of any general and uniform plan of restriction, or otherwise."
We have already seen that "if it runs with the land, the covenant binds the owner regardless of knowledge."[8] We have also seen that the "general scheme" doctrine "does not depend on whether the covenant is to be construed as running with the land."[9] In addition thereto, we conclude that, under the averments of the amended complaint, defendant Sabal was upon affirmative personal notice that said property was restricted for the benefit of the plaintiffs.[10]
Batman v. Creighton, Fla.App. 1958, 101 So.2d 587, was a case where suit was brought by property owners in a subdivision seeking the cancellation of a similar restrictive covenant. The Circuit Court upheld the covenant in question and dismissed the suit. Upon appeal, this Court affirmed. On the question of notice here involved, we quote the opinion in Batman, taken from 8 Fla.Jur., Covenants and Restrictions, § 38, p. 536, as follows:
"Necessity for Notice.  Restrictive covenants are only enforceable against those who have notice of such restrictions; those purchasers with notice of such restrictions are bound in equity thereby, and purchasers of property are held to have notice of the restrictive covenants contained in the deeds. Moreover, a purchaser in whose chain of title a deed appears which contains the restrictive covenant is chargeable with notice from the record, even though the restrictive covenant does not appear in his immediate deed, although where a deed does not include or refer to the restriction or to any document or record containing it, and the restriction is not contained or referred to in any muniment of title or on the plat of the subdivision or otherwise to afford binding constructive notice to a purchaser, the restriction will not be enforced." (Emphasis supplied).
It will be observed that a property owner, to be bound by such restrictive covenants, must have either actual or constructive notice. The phrase "actual or constructive" recurs frequently in the cases and other authorities hereinbefore cited. The usual instance of constructive notice, is of course, restrictions in a recorded deed or plat. And the authorities are practically unanimous in holding that the recorded deed containing such restriction is not necessarily the immediate deed by which the instant owner takes or has taken title; it may be in an antecedent deed, even the deed from *312 the original common grantor. 20 Am.Jur.2d, § 309, p. 872, states the rule as follows:
"A purchaser in whose chain of title a deed appears which contains the restrictive covenant is chargeable with notice from the record, even though such covenant does not appear in his immediate deed. Following this view, a recorded deed to a lot in a subdivision, containing restrictions imposed under a general plan, is generally held sufficient to charge a subsequent purchaser of the lot with notice of such restrictions. Within the meaning of the principle permitting enforcement in equity of a personal covenant concerning and applicable to land or an interest therein taken by a transferee of the covenantor with notice thereof, the constructive notice afforded by recitals thereof or references thereto in a recorded deed which constitutes a part of the chain of title of the transferee is sufficient to bind him."
Other jurisdictions have generally adopted the liberal view. Thus, it has been held that a restrictive covenant in a purchaser's chain of title charges him with notice of a mutually convenanted community scheme. Enderle v. Leslie Const. Co., 102 N.J. Eq. 569, 141 A. 758; Southwest Petroleum Co. v. Logan, 180 Okla. 477, 71 P.2d 759; Craven County v. First-Citizens Bank & Trust Co., 237 N.C. 502, 75 S.E.2d 620. And such constructive notice is afforded not alone by a deed in the grantee's chain of title, but may be afforded by the common grantor's deed of the other lots in the neighborhood. Turner v. Brocato, 206 Md. 336, 111 A.2d 855. And a grantee, taking lots with restrictive covenants in his favor binding the grantor and the grantor's successors as to other lots, has notice of the community scheme. DeRosset v. Bianchi, 100 N.J. Eq. 439, 136 A. 301.
Florida has fully adopted the "constructive notice" doctrine in the following cases: Sapp v. Warner, 1932, 105 Fla. 245, 141 So. 124, reaffirmed on rehearing, 105 Fla. 245, 143 So. 648; Tri-County Produce Distributors, Inc. v. Northeast Production Credit Association, Fla.App. 1963, 160 So.2d 46; Tolar v. Meyer, Fla.App. 1957, 96 So.2d 554; Daniel v. May, Fla.App. 1962, 143 So.2d 536; Davis v. Brewer, 1939, 135 Fla. 752, 186 So. 207; Maule Industries v. Sheffield Steel Products, supra. Illustrative are the Tri-County, the Daniel, and the Tolar cases.
In Tri-County appears the following (text 160 So.2d 50):
"The recording statute of this state provides that no conveyance * * * of real property * * * shall be good and effectual in law or equity against * * * subsequent purchasers for a valuable consideration and without notice, unless the same be recorded according to law. (Sec. 695.01 F.S.A.).
"This statute has been construed to mean that the proper record of a conveyance affords constructive notice of its contents (citing Tyler v. Johnson, 61 Fla. 730, 55 So. 870)."
And Daniel, supra, (first headnote):
"Purchasers of land are bound by constructive notices of restrictive covenants in their chain of title (citing Vetzel v. Brown, Fla., 86 So.2d 138; Tolar v. Meyer, Fla.App., supra)."
And in Maule Industries, supra, (fifth headnote):
"The record is notice to a subsequent purchaser of matters affecting his title which could be discovered by an examination of recorded deeds of his grantor."
A learned dissertation of the various kinds, species and legal effects of notices provided by recorded deeds affecting land titles and uses, particularly restrictive covenants, is contained in the two Sapp opinions aforesaid, each written by Justice Fred Davis.
Another type of notice with which Sabal was chargeable, other than *313 constructive notice, is what is called "implied actual notice." This is defined and illustrated in the first Sapp opinion, supra, (text, 141 So. 127):
"Notice is of two kinds, actual and constructive. `Constructive notice' has been defined as notice imputed to a person not having actual notice; for example, such as would be imputed under the recording statutes to persons dealing with property subject to those statutes. `Actual notice' is also said to be of two kinds: (1) Express, which includes what might be called direct information; and (2) implied, which is said to include notice inferred from the fact that the person had means of knowledge, which it was his duty to use and which he did not use, or, as it is sometimes called, `implied actual notice.' Cooper v. Flesner, 24 Okla. 47, 103 P. 1016, 23 L.R.A. (N.S.) 1180, 20 Ann.Cas. 29; Simmons Creek Coal Co. v. Doran, 142 U.S. 417, 12 S.Ct. 239, 35 L.Ed. 1063; Hoy v. Bramhall, 19 N.J. Eq. 563, 97 Am.Dec. 687; Acer v. Westcott, 46 N.Y.384, 7 Am.Rep. 355. Constructive notice is a legal inference, while implied actual notice is an inference of fact, but the same facts may sometimes be such as to prove both constructive and implied actual notice. Knapp v. Bailey, 79 Me. 195, 9 A. 122, 1 Am.St.Rep. 295.

"The principle applied in cases of alleged implied actual notice is that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice; that it will not suffice the law to remain willfully ignorant of a thing readily ascertainable by whatever party puts him on inquiry, when the means of knowledge is at hand. (cases cited)." (Emphasis supplied).
And in Tri-County Produce Distributors appears the following (text 160 So.2d 51):
"[T]he record of an instrument is constructive notice to creditors and subsequent purchasers not only of its own existence and contents, but of such other facts as those concerned with it would have learned from the record if it had been examined and inquiries suggested by it, duly prosecuted, would have disclosed, and if, in investigation of a title, a purchaser, with common prudence, must have been apprised of another right, notice of that right is presumed as a matter of implied actual notice. (Citing Zaucha v. Town of Medly, Fla. 1953, 66 So.2d 238; Sapp v. Warner, supra)
"It has likewise been held that if the circumstances of the transaction are such, or the record indications are of such a nature that inquiry outside of the record becomes a duty, then the failure to make such inquiry in order to determine the true status of the title to the property described in the recorded instrument would constitute a negligent omission." (Citing Chatlos v. McPherson, Fla. 1957, 95 So.2d 506). (Emphasis supplied).
And in Maule Industries (text 105 So.2d 801):
"On the matter of the effect of notice from the existence of the (railroad) tracks, appellee argues that such knowledge of the easement compelled investigation and constructively gave notice of the user's rights which due inquiry would divulge. We uphold this argument of appellee, which is well supported by authority. The cases are collected in annotations in 41 A.L.R. 1442, and 74 A.L.R. 1250." (Emphasis supplied).
The rule is well stated in 20 Am.Jur.2d § 307, p. 871, as follows:
"The notice of restrictions sufficient to charge a purchaser may be actual notice or notice of facts sufficient to put him on inquiry. For instance, the notice sufficient to charge a purchaser of a lot in a subdivision with knowledge of restrictions imposed in deeds to other lots as part of a general plan, but inadvertently or otherwise omitted from the deeds in his chain of title, may be actual or constructive, including notice of facts which ought to have put him on inquiry, such as the *314 uniform appearance of the area in which the lot is located. Thus, the uniform appearance of a particular tract, and the nature of the buildings thereon, have been sufficient to charge a purchaser of a lot in the tract with notice of a general plan of restrictions, or at least sufficient to put him on inquiry as to whether there was a general plan." (Emphasis supplied).
Applying the foregoing authorities to the facts in the instant case, as disclosed from the amended complaint, there can be no question but that Sabal had ample legal notice of the restrictive covenants covering the entire subdivision before he built his restaurant building. Aside from his free-and-easy observation of the residential character of the property and buildings surrounding him, he was put upon actual notice of the common restrictions by the plaintiffs themselves, and warned, before he went ahead with his construction, that the restrictions would be enforced. So much for the proposition of notice.
We come now to the final point presented by this appeal, viz., that the chancellor should not make final disposition of this case merely upon the sufficiency of the amended complaint as a pleading, but should accord both parties a full trial upon the many vital factual considerations involved, any of which could conceivably be decisive of the final result, one way or the other. In every case we have researched on this appeal, and they have not been inconsiderable, the final result has been arrived at only after a full trial on the merits. This probably is what prompted the text writer in 26 C.J.S. Deeds § 162(1), p. 1083, to observe that "[I]t has been declared that probably in no single subject of the law is there found a greater divergence of opinion among the courts of the several states than on the nature, extent, and construction of covenants restricting buildings and the use of land." What he was actually saying, of course, was, not that there is an absence of well-defined principles of law governing such covenants, but because the facts upon which the myriad of reported cases are grounded are so diverse and multiform as to result in varied degrees, shades and complexions of judicial holdings respecting the same fundamental legal principles.
But this is all the more reason why in a case such as this, where there are substantial legal questions involved, the final decree disposing of the rights of the parties should not be entered until after a full "airing out" has been had on the evidentiary level. It will, of course, be clearly understood that everything we have hereinbefore mentioned, with respect to the facts of the instant case, has been taken from the face of the amended complaint and all favorable inferences flowing therefrom, which was necessitated by the legal status of the case as it came to us on appeal. Upon the factual issues of the case, which will be made up by the answer and other pleadings as may be filed by Sabal to the amended complaint, both parties will have ample opportunity to produce their respective cases in evidence, thereby enabling the chancellor to write his final decree from facts judicially found by him.
Factual considerations involved upon which evidence might be adduced, are: the intent of the parties, both the original grantor and his original grantees, at the time the deeds were first given, as to creating a general plan of residential property; any change of conditions or circumstances in the subdivision since the original deeds were given, and to what extent, if any; any breaches of similar covenants by any other property owner or owners in the subdivision; the type and character of buildings and improvements erected in the subdivision since the original deeds were given, and the purposes to which the same have been applied; the reasonableness of the time element as to the effectiveness of the restrictive covenants, in the light of their apparent unlimited duration; the comparative injury and the balancing of the relative conveniences of the parties in the event judgment is for the plaintiffs (see Ortega Company *315 v. Justiss, Fla.App. 1965, 175 So.2d 554; Daniel v. May, supra; Stephl v. Moore, Fla. 1927, 94 Fla. 313, 114 So. 455); whether the case, at some stage of the testimony, should perhaps be transferred to the law side of the Court; etc. In thus narrating certain areas of possible factual dispute we do not intimate in the slightest any opinion or inclination thereon; that will be taken care of by the able chancellor at the proper time.
The final order appealed from is therefore 
Reversed and the cause is remanded to the lower Court for further proceedings not inconsistent with this opinion.
SHANNON, Acting C.J., and WEHLE, VICTOR O., Associate Judge, concur.
NOTES
[1] One exception was lots 1 and 2 in Block 1, the conveyance to which permitted construction of an art studio and art craft shop in conjunction with apartments or dwellings, but such exception is without relevance to the instant law suit. Also all deeds from the common grantor described the tracts by metes and bounds.
[2] The owners of all other lots in the subdivision joined in the suit except the owners of Lot 5 of Block 2, and of lot "A".
[3] Such as here in the incidents of Lots 1 and 2 of Block 1.
[4] 20 Am.Jur.2d, § 309, p. 872.
[5] Cf. Wahrendorff v. Moore, Fla. 1957, 93 So.2d 720
[6] Florida has no such limitations by statute.
[7] The covenant involved in the Maule case, while dissimilar in character, was comparable in principle, to the covenant involved here. They both come squarely within the characteristics of a covenant running with the land as outlined in the quoted portion of the Maule opinion.
[8] 26 C.J.S. § 167(1) p. 1138; supra, p. 310.
[9] 26 C.J.S. § 167(2) p. 1143; supra, p. 307.
[10] There is no question of the legal necessity for the existence of notice; the holding here is that Sabal in fact had it.