DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**THE WATERVIEW TOWERS CONDOMINIUM ASSOCIATION, INC.,** a Florida corporation not-for-profit, **LAURA BENNETT, HELEN BOSSMAN,** and **THOMAS J. O'NEILL,** individually,
Appellants,

v.

**CITY OF WEST PALM BEACH,** a Florida Municipal Corporation, and **PALM HARBOR HOTEL, LLC,** a foreign limited liability company,
Appellees.

No. 4D16-2858

[November 1, 2017]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Edward A. Garrison, Acting Circuit Judge; L.T. Case No. 50-2014-CA-005009-XXXX-MB.

Robert J. Hauser of Pankauski Hauser PLLC, West Palm Beach, Robert Sweetapple of Sweetapple, Broeker & Varkas, PL, Boca Raton, and John R. Eubanks, Jr. of Breton, Lynch, Eubanks & Suarez-Murias, P.A., West Palm Beach, for appellants.

K. Denise Haire and Douglas N. Yeargin, Office of the City Attorney, West Palm Beach, for appellee, City of West Palm Beach.

Bruce S. Rogow and Tara A. Campion of Bruce S. Rogow, P.A., Fort Lauderdale, and Joseph Ianno, Jr. and Henry S. Wulf of Carlton Fields Jorden Burt, P.A., West Palm Beach, for appellee, Palm Harbor Hotel, LLC.

GROSS, J.

We hold that unit owners and a condominium association have standing to enforce certain development restrictions contained in condominium documents, as defined in the declaration of condominium.

### *Overview*

The property central to this litigation is owned by the City of West Palm Beach. It is bordered on the west side by Flagler Drive, on the east side

by Lake Worth, on the north side by 5th Street, and on the south side by 1st Street.

It is a single piece of property, divided into three parcels: R-1, C-1, and C-2. The parcels are aligned like this:



Palm Harbor Hotel, LLC (the "Hotel") wants to build a hotel and parking garage on parcel C-2. The neighbors living in the condominium tower located on parcel R-1 oppose the Hotel's plans.

This action was brought by The Waterview Towers Condominium Association, Inc. and three individuals who own residential units in the condominium (collectively, the "Plaintiffs") against the City and the Hotel. The Plaintiffs asked the circuit court to declare that the Hotel's plans violated development restrictions found in various documents.

### *Historical Background*

In 1968, the City leased the parcel to the West Palm Beach Marina, Inc. for 99 years. In 1979, the City Commission passed Ordinance 1455-79 which permitted the City to amend the lease. The City, as lessor, and the Marina, as lessee, executed the "Consolidated and Amended Lease" (the "Lease"). Both parties to the Lease anticipated future development of the property. While a portion of the property was to be maintained as a

marina,[1] the remainder of the property could be used in almost any manner.

Article XXX, section 5 of the Lease is important because it contains two development restrictions the Plaintiffs seek to enforce in this action, the "View Restriction," and the "Unanimity Provision."  The relevant language reads:

<u>Art. XXX – Miscellaneous Provisions</u>

It is further mutually covenanted and agreed by and between both of the parties hereto as follows:

* * *

Section 5.  Lessee agrees that it will use good site planning and architectural design so that the buildings will fit into the character of the downtown area of West Palm Beach or enhance the same, and retain the waterfront characteristics of the area.  *There are 1,573.35 feet of waterfront view, measured on a north-south line, presently existing, of which Lessee agrees to retain open and free from building obstructions as viewed from Flagler Drive [62.82%].*  All development of the Leasehold Premises herein shall be pursuant to *a site plan to be approved by resolution or motion of the City Commission unanimously passed, and any modification, change or amendment thereto shall require a unanimous vote of approval of same* by the City Commission of the City of West Palm.[2]

Under Article XXXVI of the Lease, entitled "Condominium Provisions," the parties agreed that the entire property would be submitted to condominium ownership in accordance with the Condominium Act.  The plan for the "leasehold condominium" was to divide the property into a residential and a commercial portion.  The residential portion would be further divided into 132 units, and the commercial portion would be

---

[1] The marina, parcel C-1, was the subject of *City of West Palm Beach v. Board of Trustees of the Internal Improvement Trust Fund*, 714 So. 2d 1060 (Fla. 4th DCA 1998), *approved*, 746 So. 2d 1085 (Fla. 1999).  That case held that the City's ownership interest in parcel C-1 extended only to the "land immediately beneath the four piers, referred to by the trial court as the 'footprint' of the piers."  *Id.* at 1066.
[2] All emphases supplied unless otherwise noted.

divided into two units. The operation of both the residential and commercial portions would be conducted by the Association.

In addition to the development restrictions set forth above, the Plaintiffs sought a declaration that development of Unit C-2 is limited to a four-story building with surface parking only. The Plaintiffs' argument relies on the following language found under Article XXXVI of the Lease:

> . . . The Commercial Portion will include boat dockage facilities, a marina office with related facilities, and *surface parking*; additionally, a commercial building having approximately one hundred (100') feet of frontage on Flagler Drive and *not exceeding four (4) stories* in height may be constructed on the Commercial Portion.

The following definitions found within the "Condominium Provisions" of the Lease are relevant to this appeal:

> l. "Condominium Documents" means in the aggregate the "Declaration" (as hereinafter defined), Articles, By-Laws, *this Lease* and all of the instruments *and documents referred to therein.*
>
> * * *
>
> q. "Lessee" means in the first instance West Palm Beach Marina, Inc. . . .; and in the second instance upon [the Marina's] assignment of the Lease . . . to LRI, "Lessee" means LRI; and finally, after Submission and upon assignment of the First Unit, *"Lessee" means the Unit Owners.*

One of the documents "referred to" by the Lease is a site plan. In June of 1979, "Site Plan 7" was unanimously approved by the City Commission. The Plaintiffs argue that language in Site Plan 7 imposes the same four-story height restriction as well as a square footage restriction on the future development of Unit C-2. Site Plan 7 contains this "NOTE:"

> THE COMMERCIAL STRUCTURE SHALL NOT EXCEED FOUR STORIES IN HEIGHT AND 20,000 Sq. Ft. IN AREA. THE COMMERCIAL STRUCTURE MAY BE LOCATED ANYWHERE SOUTH OF THIRD STREET, PROVIDED ITS LOCATION IS IN COMPLIANCE WITH THE CITY OF WEST PALM BEACH ZONING ORDINANCES. LESSEE MAY BUT IS NOT REQUIRED TO BUILD THE COMMERCIAL STRUCTURE.

Shortly after the Lease was executed, it was assigned by the Marina to Leisure Resorts, Inc. ("LRI"). In 1981, LRI established a condominium on the entire leased parcel by filing of the "Declaration of Condominium of The Waterview Towers, A Condominium" (the "Declaration"). The condominium, including residential and commercial units, was named "The Waterview Towers, A Condominium."

Although not attached to the Declaration, the Lease is referenced throughout the document and, significantly, the Lease and all documents referenced therein are included in the Declaration's definition of the term "Condominium Documents:"

> l. "Condominium Documents" means in the aggregate this Declaration, the Articles, By-Laws, *the Lease and all of the instruments and documents referred to therein.*

In addition to the development restrictions in the Lease (and its referenced documents), the Plaintiffs sought a declaration that development of Unit C-2 is limited to a single commercial building, not exceeding seventy-five feet in height, with no more than one-hundred feet of frontage along Flagler Drive. The Plaintiffs' argument relies on the following language of the Declaration:

> . . . The Commercial Unit, designated as "C-2" on the Survey shall contain parking facilities which may be used as determined by the C-2 Commercial Unit Owner and the Developer reserves the right for and on behalf of the C-2 Commercial Unit Owner to construct *a commercial building* ("Commercial Structure") within the C-2 Commercial Unit not exceeding *seventy five (75') feet in height* with approximately *one hundred (100') feet of frontage* on Flagler Drive.

More than 25 years after establishing the condominium, in 2007, LRI sold parcels C-1 and C-2 to Leisure Resorts, LLC ("Leisure Resorts"). The parties executed a Warranty Leasehold Estate Deed and Partial Assignment of Lease Agreement which transferred all of LRI's interest in parcels C-1 and C-2, including "any and all remaining rights . . . held by Grantor as 'Developer' under the Declaration and/or as the owner of the Units."

### *Current Dispute*

In 2009, the City and Leisure Resorts executed a Development Agreement recognizing Leisure Resorts' intent to develop Unit C-2 to

include a hotel and a parking garage (the "Development Agreement"). A diagram titled "Site Plan No. 8" was attached to the Development Agreement. The conceptual site plan had been approved by Resolution 239-07 in 2007 by the City Commission.

In the Development Agreement, the City gave "conceptual approval" to development of Unit C-2 in accordance with Site Plan No. 8. Both parties agreed to "work cooperatively for a period of up to three (3) years ... towards a revised site plan ... in lieu of [Site Plan No. 8]."

In the Development Agreement, the City expressly waived any right it may have had as Lessor to enforce the provisions of Article XXX, section 5 of the Lease "with respect to the Approved Site Plan [Site Plan No. 8] or any Revised Site Plan."[3] The City and Leisure Resorts also agreed that the Development Agreement did not "constitute an amendment or modification of any of the terms and provisions of the Consolidated Lease," and none of the Condominium Documents were modified or amended to reflect the new development plan for Unit C-2.

After executing the Development Agreement, Leisure Resorts subleased Unit C-2 to the Hotel. The sublease is subject to the terms and conditions of the Lease, the Declaration, and the Development Agreement.

Sometime in 2013, the Hotel applied to rezone Unit C-2 so it could build an eight-story hotel with an attached three story parking garage. The City approved the rezoning.

Because of their opposition to the proposed development of Unit C-2 (which had been a parking lot since the early 1980's), the Association and two R-1 unit owners filed a petition for writ of certiorari in the circuit court. A three judge panel ruled that the petitioners were denied due process by the City and quashed the 2014 Development Orders. The circuit court appellate panel held that the Association and R-1 Unit Owners had standing to participate in the "quasi-judicial" zoning proceedings due to their special relationship with the land.

In this case, the Plaintiffs sought a declaration that the Association and Unit Owners have the right to enforce the development restrictions found in the referenced documents and that future development of Unit C-2 is limited to the building of:

---

[3] We note that Article XXX, section 5 includes both the View Restriction and the Unanimity Provision set forth above.

1. A single commercial office building;
2. Not exceeding four (4) stories;
3. Not exceeding ... [75 feet] in height;
4. Not exceeding ... [100 feet] of total frontage on Flagler Drive;
5. All of which may only utilize surface parking.

The Plaintiffs further sought a declaration that "any proposed construction on the C-2 Upland Parcel ... must be unanimously approved by the City Commission." As an affirmative defense, both the City and the Hotel averred that the Plaintiffs lacked standing to enforce the development restrictions.

After a non-jury trial, the circuit court ultimately issued an amended final judgment, containing the following rulings:

Plaintiffs lack standing to enforce the subject lease against the Commercial Unit Owner. Only the CITY has standing to enforce, modify or waive provisions of the Lease with respect to the Commercial Portion, including the ability to waive the provisions of Article XXX, Section 5 of the Lease.

Plaintiffs' standing to enforce the Declaration against the Commercial Portion is limited to provisions regarding the height and width of the commercial building which may be located on the C-2 Commercial Unit as set forth in Article V, paragraph D of the Declaration. There are no other restrictive covenants applicable to the Commercial Units, specifically the C-2 Commercial Unit.

Development of the C-2 Commercial Unit is not limited to a single four (4) story office building containing a maximum of 20,000 square feet.

The currently approved development and use of the C-2 Commercial Unit consists of a commercial structure and parking facilities as shown on Site Plan No. 8, the provisions of which are not challengeable because the applicable statute of limitations to challenge Site Plan No. 8 has expired.

The Development Agreement is not a statutory development agreement requiring compliance with Chapter 163 and, further, any challenges to the Development Agreement and Site Plan No. 8 are barred by the applicable Statute of Limitations.

The Association and the Residential Unit Owners do not have the right under the Lease to consent or approve any development plans for the Commercial Units. While Plaintiffs are permitted to participate as parties in quasi-judicial proceedings before the City Commission, they are not co-lessees of the Commercial Portion. They have a partial assignment of the Lease as to their units and an undivided portion of the common elements. The Commercial Units are not common elements of the Association.

This is the Plaintiffs' appeal from the Amended Final Judgment.

### *The Plaintiffs Have Standing to Bring an Action Against Any Unit Owner Not Complying with the Condominium Documents, which include the Lease*

We find that Article XXII of the Declaration grants standing to the Plaintiffs and that the Hotel and the City are bound by the Declaration.

The City's interest in the property is subject to the provisions of the Declaration because, as a lessor, the City consented to its execution. Both parties to the Lease agreed "that a leasehold condominium shall be created pursuant to the [Condominium] Act ...." The parties further agreed that upon the recording of the Declaration, the "Condominium Provisions" found at Article XXXIV "shall supplement the Lease."

By statute,

> [a] person who joins in, or consents to the execution of, a declaration subjects his interest in the condominium property to the provisions of the declaration.

§ 718.104(6), Fla. Stat. (1981). Because the City expressly consented to the execution of the Declaration, the City's interest in the property is subject to the provisions of the Declaration pursuant to section 718.104(6).

The Hotel and the City argue that the residential unit owners lack standing to enforce the Declaration against the commercial unit owners. We disagree and find the Declaration clear and unambiguous on this issue. The drafter of the Declaration was aware of the mixed-use development being created and was meticulous. He knew how to allocate rights and remedies to each category of Unit Owner being created. When

the drafter wanted to distinguish between Commercial and Residential Units and Commercial and Residential Unit Owners, he did so.

For instance, Exhibit C to the Declaration is entitled "Schedule of Shares." It apportions the "percentage share in Common Elements, Common Expenses and Common Surplus." This Exhibit is referenced throughout the Declaration because it allocates to each unit owner their "share" of these items. Exhibit C lists all of the residential units and then lists the two commercial units, assigning shares to every unit. This shows that when he intended to delineate between the residential unit owners and the commercial unit owners, the drafter used precise language.

A second example of the drafter's delineation between the residential and commercial units is found regarding voting rights. Under the Declaration, membership in the Association is divided into three classes – residential, C-1, and C-2. Membership on the Board is divided into the same three classes.

A third example of the drafter distinguishing between the residential and commercial units is found under the section entitled "Description of Improvements." There the drafter refers to the survey, differentiates between the "Residential Portion" and the "Commercial Portion," and explains that "Residential Limited Common Elements are reserved for the exclusive use of the Residential Units."

A fourth example of the drafter's delineation between the residential and commercial units is found under the section entitled "Occupancy and Use Restrictions." There, the drafter carefully spelled out the rules applicable to the "Residential Units" (addressed under subsection A) and the rules applicable to the "Commercial Units" (addressed under subsection B).

When the drafter reached Article XXII of the Declaration, entitled "Remedies for Violation," he *did not delineate* between Residential and Commercial Unit Owners. The Article provides:

> *Each* Unit Owner shall be governed by and shall comply with the Act, all of the Condominium Documents and all amendments to the Condominium Documents. Failure to do so shall entitle the Association, *any* Unit Owner, [or Mortgagee] to bring an action for injunctive relief, damages or both, and such parties shall have all other rights and remedies which may be available at law or in equity.

The Hotel is bound as the "Unit Owner" of Unit C-2.[4]  Under the quoted Article, the Hotel "shall comply" with "all of the Condominium Documents."  By definition in the Declaration, one of the Condominium Documents is the Lease.  The second sentence quoted above gives both the Association and *any Unit Owner* the right to bring an action against a noncomplying unit owner.  Again, the language used is clear and unambiguous.  This paragraph of the Declaration bestows standing on the Association and each Unit Owner whenever any other Unit Owner fails to comply with the Condominium Documents.[5]

Under the express language of the Declaration, any Unit Owner and the Association, may bring an action when another Unit Owner violates the Lease (a Condominium Document).  We find the circuit court erred when it made the blanket declaration that "Plaintiffs lack standing to enforce the subject lease against the Commercial Unit Owner" and that "only the City has standing to enforce, modify or waive provisions of the Lease with respect to the Commercial Portion."

### The Unit Owners Have Standing as Co-lessees and Grantees from a Common Grantor to Enforce the Restrictive Covenants Found in the Lease against the Owner of Unit C-2

Under the Lease, the City is the lessor and both the commercial and residential unit owners are lessees.  The Lease defines "Lessee" as "the Unit Owners" "upon the assignment of the First Unit."

Each residential unit owner received a "partial assignment" of the Lease.  Under the partial assignments, the unit owners were referred to as "Grantees," and each grantee assumed and accepted from the grantor "the leasehold rights and obligations" enumerated in the partial assignment.  Each grantee was obligated to pay his portion of the rent and operating expenses due under the Lease and received certain "leasehold rights."

The residential unit owners seek to use their status as "co-lessees" to enforce building restrictions found in the Lease against the owner of Unit C-2, a co-lessee. The provisions the unit owners seek to enforce are:

---

[4] The Hotel is bound by the sublease from Leisure Resorts.

[5] This argument also supports the Plaintiffs' standing under Florida Statutes section 718.303(1) (2016) (allowing actions by both "the association or by a unit owner against ... a unit owner" who fails to "comply with [the] documents creating the association.")

1. The View Restriction and the Unanimity Provision contained in Article XXX, Section 5.

2. The Four-Story Height and Surface Parking Restrictions contained in Article XXXVI.

3. The 20,000 Square Footage Restriction found in Site Plan 7 incorporated into the Lease at Article XXX, section 5.

These building restrictions are restrictive covenants, "equitable rights arising out of the contractual relationship between and among the property owners." *Cudjoe Gardens Property Owners Ass'n, Inc. v. Payne*, 779 So. 2d 598, 598-99 (Fla. 3d DCA 2001).

While covenants restraining the free use of realty are not favored, "in order to provide the fullest liberty of contract and the widest latitude possible in disposition of one's property, restrictive covenants are enforced so long as they are not contrary to public policy, do not contravene any statutory or constitutional provisions, and so long as the intention is clear and the restraint is within reasonable bounds." *Hagan v. Sabal Palms*, 186 So. 2d 302, 308-09 (Fla. 2d DCA 1966).

Restrictive covenants may be enforced by grantees among or between themselves where the grantees obtained their property from a common grantor and the restrictive covenants were placed in the transferring instrument as part of "a general plan of development or improvement," or a "general building scheme." *Id.* at 307. "Whether restrictions in deeds are part of a general scheme is to be determined by the intention of the parties, as gathered from the words used, interpreted in the light of all the circumstances and the pertinent facts known to the parties." *Id.*

Where there is no general building scheme, a restrictive covenant can be enforced between grantees *inter sese* where the covenant provides mutual or reciprocal benefits to the grantees. *Rea v. Brandt*, 467 So. 2d 368 (Fla. 2d DCA 1985).

> Basically, the right to enforce a restrictive covenant requires proof that the covenant was made for the benefit of the party seeking to enforce it. *Osius v. Barton*, 147 So. 862 (Fla. 1933). A subsequent grantee who seeks to enforce a restrictive covenant created by a common grantor against another subsequent grantee of a separate parcel of realty must show that the covenant was intended to apply to both parcels. *Osius.*

*Id.* at 369.

Even where there is no general building scheme and no reciprocal benefit among grantees, a restrictive covenant may be enforced by one neighbor against another where the restriction is found to be a negative easement or equitable servitude on the land. *See Fiore v. Hilliker*, 993 So. 2d 1050 (Fla. 2d DCA 2008) (finding waterfront lot owner could be prevented from blocking view of adjacent owner by a negative easement created by the common grantor).

Here, the restrictive covenants imposed by the Lease on Unit C-2 are enforceable by the unit owners *inter sese* because (1) they were part of a general building scheme; and (2) the restrictions provided mutual and reciprocal benefits to all of the unit owners.

The general building scheme is revealed by the unambiguous language of the Lease. The parties agreed that the property would be developed as a single mixed-use condominium. The entire condominium was to be developed pursuant to a "site plan" that had to be unanimously approved by the City Commission. The developer/lessee agreed to "maintain the character of a marina on a portion of the property" and "use good site planning and architectural design so that the buildings will fit into the character of the downtown area of West Palm Beach or enhance the same, and retain the waterfront characteristics of the area." The developer/lessee further agreed to "retain open and free from building obstructions" sixty-two percent of the "waterfront view."

This general building scheme contemplated a mixed-use development where all unit owners would benefit from the presence of the marina, the view, and the unique waterfront character of the area.

"Building restrictions imposed by a grantor on lots, being evidently for the benefit, not only of the grantor, but also of his grantees and subsequent successors in title, the burden, as well as the benefit, of the restrictions is an incident to ownership of the lots, because in a neighborhood scheme the burden follows the benefit." *Hagan*, 186 So. 2d at 307. The development restrictions found in the Lease, drafted to further the general building scheme, are enforceable by each of the unit owners among or between themselves. *Id*. at 308. Equity does not permit the owner of unit C-2, which has benefitted from the general building scheme, to disregard the restrictions that bind the other unit owners simply because unit C-2 permits a commercial use.

Similarly the restrictive covenants are enforceable by the residential unit owners because they were imposed for the benefit of all the unit owners. Building restrictions have been held to be enforceable by neighbors on the adjacent property. *See Rea*, 467 So. 2d 368; *Palm Point Property Owners' Ass'n of Charlotte Cty., Inc. v. Pisarski*, 626 So. 2d 195 (Fla. 1993).

In *Rea*, the restrictive covenant stated "no water lot shall have a fence." When one property owner sought to enforce the covenant against an adjacent owner, the court found that the restriction was "clearly intended to benefit and burden more than a single water lot. The restriction was in the chain of title or deed of each property. Thus, there was a mutual and reciprocal beneficial interest running to the adjacent parcels held by appellants and appellees." *Rea*, 467 So. 2d at 370 (finding appellants in violation of the restrictive covenant and directing them to remove their fence).

In *Palm Point*, an association sought to enjoin a lot owner from violating deed restrictions (building a pool, stem wall, and dock). While the supreme court found that the association lacked standing because the covenants were not made for its benefit, the court noted that individual property owners "*clearly* have standing to enforce the covenants." *Id.* at 198 (emphasis added) (affirming the Second District's finding that "any one" of the individual property owners "could sue to enforce the restrictions at issue in this case." *Palm Point Property Owners' Ass'n of Charlotte Cty., Inc. v. Pisarski*, 608 So. 2d 537, 538 (Fla. 2d DCA 1992)).

Here, restrictive covenants were imposed on the entire condominium; every unit was burdened by and benefited from the development restrictions. The view restriction enhanced the character of the condominium, inspiring its name: The Waterview Towers, A Condominium. The limit on the number of stories and the square footage restrictions further preserved the view while controlling the number of people and traffic on the parcel. The unanimity provision helped protect the general building scheme from a change in the political winds.

In sum, each of the restrictions which the residential unit owners, as co-lessees, seek to enforce on Unit C-2 benefitted the entire condominium. Under *Osius* and its progeny, the development restrictions are enforceable by each of the grantees (unit owners) from the common grantor (the City).

### *The Association Has Standing Under The Condominium Act And Florida Rule Of Civil Procedure 1.221*

The Condominium Act provides that an association may institute an action "in its name on behalf of all unit owners concerning matters of common interest to most or all unit owners." § 718.111(3), Fla. Stat. (2014). Similarly, Rule 1.221 provides:

> [A] condominium association ... may institute ... actions or hearings in its behalf on behalf of all association members concerning matters of common interest to the members, including, but not limited to: (1) the common property, area, or elements ....

Fla. R. Civ. P. 1.221.

"This court has recognized that an association may sue and be sued as the representative of condominium unit owners in an action to resolve a controversy of common interest to all units." *Four Jay's Const., Inc. v. Marina at Bluffs Condo. Ass'n, Inc.*, 846 So. 2d 555, 557 (Fla. 4th DCA 2003); *see generally Homeowner's Ass'n of Overlook, Inc. v. Seabrooke Homeowners' Ass'n, Inc.*, 62 So. 3d 667 (Fla. 2d DCA 2011).

Under the Declaration, the Association is responsible for the operation of the entire condominium. The commercial parcels are part of the condominium. While the commercial parcels are not "common elements," because they are part of the condominium, they are part of the "common property" and the "common area."

An aerial view of the property reveals that the unit owners share points of ingress and egress off Flagler Drive. In addition, the residents' pool and a portion of the marina directly abut Unit C-2. Any structure on C-2 will affect the use and enjoyment of the entire condominium property (including light, view, and noise). For these reasons, development of Unit C-2 concerns a matter of "common interest" to members of the Association.

Because Unit C-2 is part of the common property, and because development of the common property involves matters of common interest to members of the Association, the Association had standing under the Condominium Act and Florida Rule of Civil Procedure 1.221 to pursue this action.

### *Development Restrictions Limit the Future Development of Unit C-2*

*1. Development Restrictions in the Declaration Run With the Land.*

- 14 -

By statute, "All provisions of the declaration are enforceable equitable servitudes, run with the land, and are effective until the condominium is terminated." § 718.104(7), Fla. Stat. (1981).

By their Second Amended Complaint, the Plaintiffs sought a declaration that development on Unit C-2 was limited to a single commercial building, not exceeding 75 feet in height, and not exceeding 100 feet of total frontage on Flagler Drive – all development restrictions found in the Declaration. The City and the Hotel concede that they were bound by these restrictive covenants.

The trial court granted the Plaintiffs' prayer for declaratory relief in part, finding there were enforceable restrictive covenants in the Declaration regarding the height and width of the commercial building. However, the order went too far by finding that there are "no other restrictive covenants applicable" to Unit C-2 and that the only restrictive covenants enforceable by any of the Plaintiffs are those regarding "the height and width of the commercial building." This was error.

The trial court was not asked to scour the Declaration for restrictive covenants enforceable by the Plaintiffs. Indeed, there are at least three additional restrictive covenants found in the Declaration that are enforceable by the Plaintiffs:

> 1. The Association would have standing to enforce the requirement that Unit C-2 "contain parking facilities."
>
> 2. The Association would have standing to establish and enforce rules and regulations regarding easements and rights of way crossing Unit C-2.
>
> 3. The Association and Unit Owners would have standing to enforce the requirement that the C-2 Unit Owner conduct a lawful commercial enterprise.

The only restrictive covenants found in the Declaration that the Plaintiffs raised in this case are those with regard to height and width of the commercial building. Thus, we reverse the trial court's order to remove all language that forecloses the Plaintiffs' rights to enforce the restrictive covenants contained in the Declaration though not raised in this litigation.

> *2. The Unit Owners are Entitled to Enforce Restrictive Covenants Contained in the Lease.*

- 15 -

As indicated above, the individual Plaintiffs have standing to enforce the restrictive covenants found in the Lease against the owner of Unit C-2. The following development restrictions are affected by the conclusion reached in this section:

| Restriction | Language | Source |
|---|---|---|
| The View Restriction | "Lessee agrees to retain 62.82% of waterfront view (as viewed from Flagler Drive) open and free from building obstructions." | Lease, Art. XXX, § 5 |
| Square Footage | "The commercial structure shall not exceed ... 20,000 sq. ft. in area ..." | Site Plan 7 |
| Number of Stories | "[A] commercial structure ... not exceeding four (4) stories in height may be constructed on the Commercial Portion." | Lease, Art. XXXVI, § 2.b. |

The trial court therefore erred when it found that "Development of the C-2 Commercial Unit is not limited to a single four (4) story office building containing a maximum of 20,000 square feet."

*3. Because the Lease and Declaration are Ambiguous on the Issue of Two Commercial Buildings on Unit C-2, the Documents Cannot be Read to Preclude a Parking Garage.*

The Plaintiffs argue that only one commercial building can be built on Unit C-2 and because of this "one building" restriction, a parking garage cannot be built along with a hotel. The Hotel and the City maintain that *in addition to* a commercial building, a "parking facility" may also be placed on Unit C-2, and that the "parking facility" may be a multi-level garage.

The relevant language reads:

| Language | Source |
|---|---|
| "The Commercial Unit, designated as "C-2" on the Survey *shall contain parking facilities* which may be used as determined by the C-2 Commercial Unit Owner *and* the Developer reserves the right for and on behalf of the | Declaration, Art. V-D |

| | |
|---|---|
| C-2 Commercial Unit Owner to construct *a commercial building* ("Commercial Structure") within the C-2 Commercial Unit ..." | |
| "... [T]he Developer reserves the right for and on behalf of the C-2 Commercial Unit Owner *to construct the Commercial Structure and/or parking facilities* within the C-2 Commercial Unit." | Declaration Art. XXIII-A |
| "... The Commercial Portion will include boat dockage facilities, a marina office with related facilities, and *surface parking* ..." | Lease, Art. XXXVI-2.-b. |

"Restrictive covenants are not favored and are to be strictly construed in favor of the free and unrestricted use of real property." *Wilson v. Rex Quality Corp.*, 839 So. 2d 928, 930 (Fla. 2d DCA 2003). "Any doubt as to the meaning of the words used must be resolved against those seeking enforcement." *Id.*

The documents do not specify a limitation on the nature of the potential parking. A "parking facility" is a broad term that includes structures like a garage. The Lease's reference to "surface parking" does not mean that all parking had to be surface parking. Given the strict construction imposed on restrictive covenants, the ambiguous tension between "parking facilities" and "surface parking" in the Declaration and the Lease supports the position of the Hotel and the City on this issue.

> *4. The Trial Court Erroneously Found That Site Plan No. 8 Is The "Currently Approved Development."*

Plaintiffs argue that the trial court's holdings regarding Site Plan No. 8 were erroneous. The trial court held:

> The currently approved development and use of the C-2 Commercial Unit consists of a commercial structure and parking facilities as shown on Site Plan No. 8, the provisions of which are not challengeable because the applicable statute of limitations to challenge Site Plan No. 8 has expired.

"Site Plan No. 8," however, was merely a "conceptual plan" needing additional governmental approvals to become final.

The "conceptual site plan" was approved by the City Commission "in its capacity as the land owner" — not in its governmental capacity. The Resolution approving the conceptual site plan states that the plan is "*deemed to be 'Site Plan No. 8' under the Marina Lease*." Although the Lease's Unanimity Provision was satisfied as evidenced by Resolution 239-07, the "conceptual site plan" attached to the Resolution still needed governmental and regulatory approvals and permits.

The Ordinances and Resolutions in evidence do not establish that the conceptual site plan ever received the requisite governmental approval. Thus, while Site Plan No. 8 is the currently-approved "site plan" under the Lease, the trial court's holding that it is the "currently approved development and use of the C-2 Commercial Unit" was too broad.

For these reasons, we reverse the Amended Final Judgment and remand to the circuit court for proceedings consistent with this opinion.

KLINGENSMITH, J., concurs.
CIKLIN, J., dissents with opinion.

CIKLIN, J., dissenting.

I respectfully dissent.

The plaintiffs below are not lessees of the commercial portion of the subject plat and do not have standing to take independent legal action to enforce the underlying lease.

The 1981 Declaration of Condominium does not grant or authorize the plaintiffs to enforce any restrictions in the Lease particularly because the Declaration clearly delineates between the "Residential Portion" and "Commercial Portion" of the property and Article XII. B. provides that the commercial lessees "may conduct any commercial enterprises on the Commercial Portion to the extent permitted by law and the Lease" and that "[n]othing contained in this Declaration shall limit the right of the Commercial Unit Owners or their assigns, lessees, or licensees to conduct commercial enterprises on the Commercial Portion."

Clearly, the interplay between Article XIX, section 1, Article XXII, and Article XXX of the lease contemplates multiple uses of the property and even permits commercial lessees to change uses and site plans provided that the City's duly elected policy makers—in a quasi-judicial setting—exercise their discretion to permit such changes. As a historical matter of fact, the 2009 Development Agreement between the City and Leisure

Resorts, LLC (Palm Harbor's sublessor) modified the lease requirements of Article XXX, section 5 to actually require the City Commission's *unanimous consent* of any changes to the site plan—again, after a full quasi-judicial hearing before the West Palm Beach City Commission.

Nothing in the Declaration of Condominium or the laws of the State of Florida supports the notion that the plaintiffs have standing to enforce, modify, waive or contest provisions of the Lease with respect to the Commercial Portion.  Nor do they have standing under the condominium documents to oversee or challenge use of the property approved by the City in its proprietary capacity.

Ultimately, of course, all power rests with the plaintiffs through the power of the ballot box, but until that time, the duly elected members of the West Palm Beach City Commission have the unbridled discretion to make all decisions pertaining to the commercial portion of the subject property.

The plaintiffs assert that the "*Amended Final Judgment* is inconsistent" because it "**provides standing**" . . . to enforce . . . restrictions . . . on the frontage and height of any new structure on the [commercial] parcel," while denying standing "to enforce other more detailed restrictions."  In fact, the Lease and Development Agreement addressed frontage and height and once the City Commission approved Site Plan 8 in June 2007, and incorporated it into the 2009 Development Agreement, the issues of height and frontage under the lease were resolved.  (The only remaining restriction on the development of the C-2 unit was the 100' width and 75' height size limitation contained in Article V.D. of the Declaration).

In my opinion, the trial court properly found that the 2009 Development Agreement was not governed by Chapter 163 and, notwithstanding that judicial determination, the time to challenge the 2009 Development Agreement, including Site Plan 8, has expired in any case.

I would affirm.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***